IN THE MATTER OF: S.E.P. AND L.U.E., MINOR CHILDREN

No. COA06-1662

(Filed 3 July 2007)

**Termination of Parental Rights— lack of subject matter jurisdiction—improper or no signature**

The Court of Appeals determined ex mero motu that the trial court's order terminating respondents' parental rights should be vacated based on its lack of subject matter jurisdiction to enter the orders first granting DSS nonsecure custody of the two minor children, because: (1) the alleged signature on DSS's petition with respect to S.E.P. was not in fact the director's signature; (2) DSS's amended petition regarding L.U.E. on 8 April 2004 showed no signature in the verification section; and (3) DSS was not an agency awarded custody of the minor children by a court of competent jurisdiction as required by N.C.G.S. § 7B-1103(a), and DSS did not have standing to file the termination petitions.

Appeal by Respondents from orders entered 16 October 2006 by Judge Wayne L. Michael in Iredell County District Court. Heard in the Court of Appeals 14 May 2007.

**IN RE S.E.P. & L.U.E.**

[184 N.C. App. 481 (2007)]

*Lauren Vaughan for Petitioner-Appellee Iredell County Department of Social Services.*

*Holly M. Groce for Guardian ad Litem-Appellee.*

*Jeffrey L. Miller for Respondent-Appellant Mother N.P.*

*Richard Croutharmel for Respondent-Appellant Father S.P.*

STEPHENS, Judge.

Before June 2002, N.P. had given birth to two children, both of whom had been removed from her custody and permanently placed with relatives due to N.P.'s domestic violence, anger control issues, and her inability to keep from being incarcerated. In June 2002, N.P. gave birth to S.E.P. N.P. was married to S.P., and S.P. was S.E.P.'s father. On 24 September 2002, N.P. was incarcerated in the Iredell County jail for violating the terms of her intensive probation.[1] N.P. left S.E.P. in the care of Ms. Faye Miller, S.E.P.'s godmother. On 25 September 2002, N.P. informed an Iredell County Department of Social Services ("DSS") social worker that S.P., who was also incarcerated at that time, was being released from prison and was planning to take S.E.P. from Ms. Miller upon his release. On 26 September 2002, Ms. Miller contacted DSS to say that she had given S.E.P. to S.P. A DSS social worker discovered that, in turn, S.P. had left S.E.P. in the care of S.E.P.'s aunt and uncle. The aunt's own child had previously been removed from her care due to neglect. The uncle was a registered sex offender who, according to DSS, was not supposed to reside with or care for a child. That same day, a juvenile petition was filed alleging that S.E.P. was neglected and dependent, and, pursuant to the trial court's order, DSS obtained nonsecure custody of S.E.P.

On 30 September 2002, S.P. was again incarcerated after being sentenced to prison for a term of sixteen to twenty months for distributing cocaine and violating probation.

On 1 October 2002, a seven-day hearing was held on the nonsecure custody order. Following the hearing, the court entered an order continuing nonsecure custody with DSS. After a series of review hearings, an adjudicatory hearing was held 26 November 2002. At the hearing, DSS amended its 26 September 2002 petition to remove the allegations of neglect, and the trial court adjudicated S.E.P. dependent. DSS was relieved of efforts to reunify S.E.P. with S.P., and the plan of care for N.P. was reunification.

---

1. The record does not reveal why N.P. was on probation.

IN RE S.E.P. & L.U.E.

[184 N.C. App. 481 (2007)]

On 1 November 2002, N.P. was released from prison but she remained on intensive probation. Upon her release, she moved into Ms. Miller's home. On 31 December 2002, N.P. was arrested on charges of possession with intent to sell and deliver cocaine and simple assault stemming from an incident which occurred on 11 April 2002. N.P.'s pastor posted bond, and N.P. was released from jail. At some point while living with Ms. Miller, N.P. became pregnant, purportedly by Ms. Miller's son. N.P. told a DSS social worker that she got pregnant so that she would be able to take care of a baby. "You keep taking them, I keep making them[,]" N.P. said. Later in her pregnancy, N.P. told a social worker that "as long as [DSS] takes my babies away, I will continue to get pregnant."

DSS and Guardian *ad litem* reports prepared for a 20 May 2003 review hearing indicated that in late February or March 2003, N.P. moved into the home of her boyfriend, Mr. Eberhart. On 1 April 2003, N.P. was arrested after she allegedly went to Mr. Eberhart's ex-girlfriend's house and fired two shots inside the occupied residence. In its review order filed after the 20 May 2003 hearing, however, the trial court made a finding that it "has not verified and presently does not have the ability to verify the status of [N.P.'s] pending charges [from the 1 April 2003 incident]."

On 26 June 2003, N.P. was charged with assault with a deadly weapon after she threw bricks at Mr. Eberhart. N.P. was again arrested for assault with a deadly weapon in September 2003 after she attacked Mr. Eberhart with a razor blade, but the charges were dismissed.

After a review hearing on 21 October 2003, the court entered an order changing the permanent plan to "TPR/Adoption[,]" and scheduled another review hearing for 18 November 2003. Sometime after the 21 October 2003 hearing, while she was eight months pregnant, N.P. was admitted to Frye Regional Hospital after she allegedly attempted to commit suicide. N.P. told a social worker that she was upset the permanent plan had been changed to adoption. In an order filed after the 18 November 2003 hearing, the trial court changed the permanent plan to "a concurrent plan of adoption/termination of parental rights and/or reunification with either parent."

N.P. gave birth to L.U.E. in December 2003. At that time, N.P. indicated that L.U.E.'s father was Mr. Eberhart. On 4 January 2004, N.P. took a taxi to Mr. Eberhart's home where she got into a verbal and physical altercation with him. When the police arrived, both N.P. and

Mr. Eberhart had bricks in their hands. The taxi driver, meanwhile, had left the scene of the altercation with L.U.E. in the cab, but returned once the altercation ceased.

On 23 January 2004, DSS filed a juvenile petition alleging that L.U.E. was neglected. On 12 February 2004, the trial court appointed a. guardian *ad litem* and an attorney to represent L.U.E. On 24 February 2004, the trial court continued adjudication until 9 March 2004. L.U.E. continued to live with N.P. On 9 March 2004, the trial court continued the matter until 23 March 2004, and a summons was issued to N.P. to appear on that date. The matter was again continued when N.P. insisted on hiring her own attorney. Also on 23 March 2004, N.P. told a DSS social worker that Rick Eckles was the father of L.U.E. N.P. also told the social worker that she was pregnant with her fifth child.

S.P., meanwhile, was released from prison on 11 March 2004. On 25 March 2004, N.P. entered S.P.'s home without permission and assaulted him with a razor blade. S.P. was seriously injured and spent several days at a hospital. N.P. was subsequently charged with assault with a deadly weapon with intent to kill and first-degree burglary, and was incarcerated under a $40,000.00 bond. N.P. left L.U.E. in the care of Marlene Eckles, presumably a relative of Mr. Eckles. On 6 April 2004, Mr. Eckles posted bond for N.P., and she was released from prison. On 7 April 2004, N.P. tried unsuccessfully to take L.U.E. from Marlene Eckles.

On 8 April 2004, DSS filed an amended petition regarding L.U.E. in which it included the facts of the 25 March 2004 incident. DSS obtained nonsecure custody that same day. Respondents waived nonsecure custody hearings and the matter came on for adjudication on 20 April 2004. The trial court adjudicated L.U.E. neglected. Also on that date, the trial court changed the permanent plan for S.E.P. to "TPR/Adoption."

The trial court reviewed both children's cases on 19 May 2004. On that date, when asked why she had not been complying with DSS directives, N.P. stated, "I'm not crazy, just emotionally disturbed[.]" The court scheduled its next hearing for S.E.P. on 23 November 2004. As for L.U.E., the court found that Mr. Eckles had been excluded as L.U.E.'s father and that "[n]o other father has been identified for possible placement." N.P. continued to be married to S.P., and the court found that S.P. was L.U.E.'s legal father. The court ceased reunification efforts with both parents, changed the permanent plan to "TPR/Adoption[,]" and scheduled review for 22 June 2004. The hear-

**IN RE S.E.P. & L.U.E.**

[184 N.C. App. 481 (2007)]

ing was held as scheduled and the matter was scheduled for further review on 4 January 2005.

On 19 August 2004, DSS filed a motion to terminate N.P.'s and S.P.'s parental rights as to S.E.P. Although both parents filed replies to the motion, the trial court never ruled on the motion.

On 13 October 2004, DSS filed a motion for review in the case of L.U.E. after DNA testing established that Bryant Howell was the father of L.U.E. Mr. Howell had indicated to a DSS social worker that he was scheduled to appear in federal court on drug charges and that he was facing ten years in prison. Mr. Howell subsequently relinquished his parental rights to L.U.E.

S.E.P.'s case was reviewed as planned on 23 November 2004. In its order filed after that hearing, the trial court ordered "[t]hat the termination of parental rights be calendared as soon as possible[.]"

Both children's cases were reviewed on 4 January 2005. In its orders in both cases following that hearing,[2] the trial court found that since its last hearing, N.P. had been incarcerated for a probation violation and was scheduled for release in 2006.[3] The court also found that S.P. had been incarcerated and was scheduled for release in 2010. In its permanency planning hearing report filed before the 4 January 2005 hearing, DSS noted that S.E.P., now two and a half years old, had been in foster care for two years and two months, and stated that "S.E.P. is needing permanence." Nevertheless, the court scheduled its next review hearing on both children for 5 July 2005.

On 5 July 2005, the court entered an order continuing the matter until 9 August 2005 because the guardian *ad litem* attorney was on secured leave. On 9 August 2005, the court apparently issued two orders continuing the matter until 16 August 2005 due to the attorney's continued secured leave. Inexplicably, one of the orders was signed 12 May 2006 and filed 15 May 2006. The other order was signed 13 October 2005 and filed that same day.

The court reviewed both children's cases on 16 August 2005. After the hearings, the court ordered DSS to schedule termination hearings as soon as possible. It further ordered that a termination hearing was to be held before the next review hearings scheduled for 21 February

---

2. Notably, these orders were signed 2 November 2005 and filed 3 November 2005.

3. N.P. gave birth to her fifth child while incarcerated.

2006. On 20 February 2006, DSS filed a petition to terminate N.P.'s and S.P.'s parental rights to S.E.P. and a petition to terminate N.P.'s parental rights to L.U.E.[4] On 22 February 2006, the trial court entered an order continuing its review of the matters until 25 April 2006. After that hearing, the trial court entered a review order scheduling termination hearings for 11 July 2006. The trial court then continued the matter until 30 August 2006 when it discovered that the father's attorney "had [a] conflict[.]" The trial court terminated Respondents' parental rights after the termination hearing on 30 August 2006. Respondents appeal.

All of the evidence in the record suggests that throughout all of these proceedings, S.E.P. and L.U.E. have been doing well in their foster care placements.

## SUBJECT MATTER JURISDICTION

Although the issue was not raised by either Respondent, we conclude that the trial court lacked subject matter jurisdiction to enter the orders first granting DSS nonsecure custody of S.E.P. and L.U.E., and thus we vacate the orders terminating Respondents' parental rights.

"This Court recognizes its duty to insure subject matter jurisdiction exists prior to considering an appeal." *In re E.T.S.*, 175 N.C. App. 32, 35, 623 S.E.2d 300, 302 (2005) (citing *In re N.R.M.*, 165 N.C. App. 294, 296-98, 598 S.E.2d 147, 148-49 (2004)). "[A] court has inherent power to inquire into, and determine, whether it has jurisdiction and to dismiss an action *ex mero motu* when subject matter jurisdiction is lacking." *In re S.D.A.*, 170 N.C. App. 354, 358, 612 S.E.2d 362, 364 (2005) (quotations and citation omitted).

The provisions of our Juvenile Code "establish one continuous juvenile case with several interrelated stages[.]" *In re T.R.P.*, 360 N.C. 588, 593, 636 S.E.2d 787, 792 (2006). "A trial court's subject matter jurisdiction over all stages of a juvenile case is established when the action is initiated with the filing of a properly verified petition." *Id.* "[V]erification of the petition in an abuse, neglect, or dependency action as required by N.C.G.S. § 7B-403 is a vital link in the chain of proceedings carefully designed to protect children at risk on one hand while avoiding undue interference with family rights on the other." *Id.* at 591, 636 S.E.2d at 791. "[I]n the absence of [a] verification . . . [a] trial court's order [is] void *ab initio*." *Id.* at 588, 636 S.E.2d at 789.

---

4. Like Mr. Howell, S.P. relinquished his rights to L.U.E. in 2005.

**IN RE S.E.P. & L.U.E.**

[184 N.C. App. 481 (2007)]

A petition to terminate parental rights "may only be filed" by a person or agency given standing by section 7B-1103(a) of our General Statutes. N.C. Gen. Stat. § 7B-1103(a) (2005). One such agency is "[a]ny county department of social services . . . to whom custody of the juvenile has been given *by a court of competent jurisdiction.*" N.C. Gen. Stat. § 7B-1103(a)(3) (2005) (emphasis added). "Standing is jurisdictional in nature and '[c]onsequently, standing is a threshold issue that must be addressed, and found to exist, before the merits of [the] case are judicially resolved.' " *In re T.M.*, 182 N.C. App. 566, 570, 643 S.E.2d 471, 474 (2007) (quoting *In re Miller*, 162 N.C. App. 355, 357, 590 S.E.2d 864, 865 (2004)).

DSS filed a petition for adjudication with respect to S.E.P. on 26 September 2002. The verification section of that petition shows the "Signature of Petitioner" as: "Don C. Wall by Pam Frazier" with the "Director" box checked. It is obvious from the record that the alleged signature which appears on the petition was not in fact the director's signature. *See* N.C. Gen. Stat. § 10B-3(25) (2005) (defining signature as "the act of personally signing one's name in ink by hand").[5] DSS filed an amended petition regarding L.U.E. on 8 April 2004. The verification section of the amended petition shows no signature in the "Signature of Petitioner" space.

Neither the 26 September 2002 adjudication petition nor the 8 April 2004 amended petition conferred subject matter jurisdiction upon the trial court.[6] *In re A.J.H-R. & K.M.H-R.*, 184 N.C. App. 177, 179, 645 S.E.2d 791, 792 (2007) (holding that where a person signing a juvenile petition purports to sign as "Director," the purported signatures "[Director] by MH" and "[Director] by MHenderson" are insufficient to confer subject matter jurisdiction upon the trial court); *T.R.P.*, 360 N.C. at 589, 636 S.E.2d 789 (concluding that a trial court does not have subject matter jurisdiction where a petition alleging abuse, neglect, or dependency is "neither signed nor verified by the Director of [DSS] or any authorized representative thereof"). As such, the trial court never obtained jurisdiction in this action, and the orders awarding DSS custody of S.E.P. and L.U.E. were void *ab initio.*

---

5. If Pam Frazier was an authorized representative of the DSS director, she should have signed her own name and checked the "Authorized Representative" box. In that circumstance, we likely would reach a different result in the matter of S.E.P.

6. Even were we to determine that, in the case of L.U.E., the court was proceeding under the 23 January 2004 petition, we would reach this same conclusion. The 23 January 2004 petition is clearly "signed" by someone other than the director who purported to sign on the director's behalf and checked the "Director" box.

Thus, DSS was not an agency awarded custody of the minor children by a court of competent jurisdiction, DSS did not have standing to file the termination petitions, and the trial court did not have subject matter jurisdiction to enter the orders terminating Respondents' parental rights.

In making this determination, we are cognizant of the fact that S.E.P. has been in foster care since he was three months old and that he is now five years old. We are also aware that DSS informed the trial court that S.E.P. "has been lingering in the foster care system and is needing permanence" in July 2004, and that DSS informed the trial court that L.U.E. "is needing permanence" as early as October 2004. Our holding is certain to disagree with those DSS workers who have labored over both of these cases for so many years. We take this opportunity to suggest that properly verifying a petition is likely to be the easiest part of DSS's job. Similarly, we remind the trial court that " '[a] universal principle as old as the law is that the proceedings of a court without jurisdiction of the subject matter are a nullity.' " *T.R.P.*, 360 N.C. at 590, 636 S.E.2d at 790 (quoting *Burgess v. Gibbs*, 262 N.C. 462, 465, 137 S.E.2d 806, 808 (1964)). "Subject matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest, and in its absence a court has no power to act[.]" *T.R.P.*, 360 N.C. at 590, 636 S.E.2d at 790.

Because we vacate the trial court's orders for lack of subject matter jurisdiction, we need not address Respondents' assignments of error.

VACATED.

Judges JACKSON and STROUD concur.