IN THE MATTER OF D.W., A Minor Child.
No. COA07-948
North Carolina Court of Appeals
Filed January 15, 2008
This case not for publication
Wyrick Robbins Yates & Ponton, LLP, by K. Edward Greene and Tobias S. Hampson, for Respondent-Appellant.
Wake County Attorney's Office, by Al Singer, for Petitioner-Appellee.
A. Hal Morris for Guardian ad Litem.
McGEE, Judge.
M.S. (Respondent), father of the minor child D.W., appeals from an order terminating his parental rights. Although the order also terminated the rights of A.W., D.W.'s mother, A.W. is not a party to this appeal.
Wake County Human Services (WCHS) obtained non-secure custody of one-month-old D.W. on 3 January 2006 upon filing a juvenile petition alleging, inter alia, that D.W. had been denied adequate prenatal care and had been born prematurely with cocaine in his system. The petition noted that A.W. had "a long history of substance abuse and neglect of her children" resulting in a prior termination of A.W.'s parental rights to two other children. The petition further averred that A.W. denied substance abuse but "present[ed] as having recently ingested substances, including alcohol, and admit[ted] marijuana use . . . while she [was] care taker for [D.W.]" A.W. identified Respondent as D.W.'s putative father but could not provide Respondent's address or telephone number.
Respondent and A.W. signed a consent order on adjudication and disposition, which the trial court entered on 22 February 2006. Although Respondent purported to be D.W.'s father, the order noted that he was not named on D.W.'s birth certificate and had not otherwise established paternity. Respondent consented to the adjudication of D.W. as a neglected juvenile "in that [D.W.] does not receive proper care and supervision from his mother or father and resides in an environment injurious to his welfare." To the extent that Respondent wished to be reunified with D.W., the trial court ordered Respondent to: (1) obtain a substance abuse assessment and psychological evaluation and to follow the recommendations of each; (2) cooperate with WCHS to legitimate D.W.; (3) maintain stable employment and housing; (4) attend parenting classes; (5) comply with his visitation plan; and (6) contact the child support enforcement agency and pay reasonable support.
In a review order entered 6 June 2006, the trial court found that Respondent had "attended all but one of his scheduled visits, but . . . only stayed for one half hour on days that [A.W.] did not also visit." Respondent claimed that the scheduled visits with D.W. conflicted with his Friday prayer service. The trial court found that Respondent had not "completed the services recommended by [WCHS] and [o]rdered by this Court," and ordered Respondent to comply with the previously-defined requirements for reunification. The trial court altered Respondent's visitation schedule to accommodate his religious observance and scheduled a permanency planning hearing for 26 October 2006.
The trial court entered a permanency planning order on 21 November 2006, ceasing reunification efforts and changing the permanent placement plan for D.W. from reunification to adoption. The trial court found that Respondent (1) had not obtained appropriate housing, (2) had not provided proof of stable employment, and (3) had not attended parenting classes. The trial court further found that Respondent had also contradicted his prior statements by advising the trial court during the hearing that he and A.W. were "a couple and intend[ed] to stay together." The trial court found that Respondent was attending counseling, but in visits with D.W. or in interactions with others, had not demonstrated any benefit from the counseling. The trial court also fount that Respondent had told a social worker on 24 October 2006 that the social worker "`would feel the pain' if [Respondent] did not get his child back." In view of his therapist's belief that Respondent was "capable of harming himself or others[,]" the trial court suspended Respondent's visitation until he obtained a mental health assessment. WCHS filed a motion for termination of parental rights as to Respondent and A.W. on 29 January 2007. As grounds for termination, WCHS alleged, inter alia, that (1) Respondent had neglected D.W. and there was a probability of a repetition of neglect if D.W. was returned to Respondent's care, and (2) Respondent had willfully left D.W. in foster care for more than twelve months without making reasonable progress to correct the conditions which led to the placement. See N.C. Gen. Stat. § 7B- 1111(a)(1)-(2) (2005). After a hearing held on 17 and 18 April 2007, the trial court adjudicated the existence of both grounds for termination and concluded that termination of Respondent's parental rights was in the best interests of D.W. Respondent appeals.

I.
Respondent argues the trial court lacked both the subject matter jurisdiction and personal jurisdiction necessary to terminate his parental rights.
Respondent first contends that the petition filed by WCHS on 3 January 2006 was not properly verified under N.C. Gen. Stat. § 7B-403, and thus failed to vest the trial court with jurisdiction over the subject matter. We disagree.
A juvenile petition alleging abuse, neglect, or dependency must be verified by the director of the county department of social services (DSS), or by the director's authorized representative. N.C. Gen. Stat. § 7B-403(a) (2005); see also N.C. Gen. Stat. § 7B-101(10) (2005); N.C. Gen. Stat. § 108A-14(b) (2005). The North Carolina Supreme Court has held that the "failure to verify a juvenile petition is a fatal defect" that deprives the trial court of subject matter jurisdiction and renders its orders in the cause void ab initio. In re T.R.P., 360 N.C. 588, 598, 636 S.E.2d 787, 795 (2006).
In the present case, the signature line of the petition's verification section lists two names, side-by-side, as follows: "Maria Spaulding WCHS Tamika Chapman[.]" Based on our examination of the handwriting found on the "Affidavit as to Status of Minor Child" attached to the petition, it appears that Ms. Chapman wrote both names on the petition's signature line. Directly below the signature line is pre-printed language identifying the signator as "Authorized Representative of Director" and providing the mailing address and telephone number of WCHS. We note that the 22 February 2006 consent order on adjudication and disposition and a WCHS Court Summary included in the record on appeal identify Ms. Chapman as a WCHS social worker and "Human Services Senior Practitioner" involved in D.W.'s case.
Respondent alleges that the record on appeal does not identify Ms. Spaulding as a person with standing to verify a juvenile petition under N.C.G.S. § 7B-403(a). Moreover, Respondent contends that Ms. Chapman's writing of Ms. Spaulding's name on the petition does not qualify as Ms. Spaulding's "signature" for purposes of the notarial act of verification. See N.C. Gen. Stat. § 10B-3(25) (2005) (repealed effective Oct. 1, 2006) (defining "signature" as "the act of personally signing one's name in ink by hand").
In two recent cases, our Court found that juvenile petitions filed by DSS, absent a proper verification by either the DSS director or an authorized representative, did not confer jurisdiction on the trial court. In In re A.J.H-R., ___ N.C. App. ___, 645 S.E.2d 791 (2007), the petitions in question were signed, "[Director] by MH" and "[Director] by MHenderson," with the "Director" box checked, rather than the "Authorized Representative" box. Id. at ___, 645 S.E.2d at 792. We held this verification to be invalid inasmuch as (1) Ms. Henderson's mark was not the director's personal signature as defined by N.C.G.S. § 10B-3(25), and (2) "Ms. Henderson did not sign the petition in her own behalf, and the `Director' box, not the `Authorized Representative' box, under the signature line was checked." Id. at ___ & n.2, 645 S.E.2d at 792-93 & n.2.
Likewise, in In re S.E.P., ___ N.C. App. ___, 646 S.E.2d 617 (2007), our Court ruled that the trial court lacked jurisdiction in a termination of parental rights proceeding where the petition alleging neglect and dependency "show[ed] the `Signature of Petitioner' as: `Don C. Wall by Pam Frazier' with the `Director' box checked." Id. at ___, 646 S.E.2d at 621-22. Because Pam Frazier did not purport to be the DSS director, we deemed it "obvious from the record that the alleged signature which appears on the petition was not in fact the director's signature." Id. at ___, 646 S.E.2d at 621. We noted, however, that "[i]f Pam Frazier was an authorized representative of the DSS director, she should have signed her own name and checked the `Authorized Representative' box. In that circumstance, we likely would reach a different result[.]" Id. at ___ n.5, 646 S.E.2d at 621 n.5.
Both In re A.J.H-R. and In re S.E.P. addressed a circumstance in which an unidentified person attempted to verify a juvenile petition on behalf of the DSS director. By contrast, in In re Dj.L., ___ N.C. App. ___, 646 S.E.2d 134 (2007), "Betty Hooper" verified the petition as "petitioner" and listed her address as "Youth and Family Services," a division of the county DSS. Id. at ___, 646 S.E.2d at 137. We found that the face of the petition indicated that "Betty Hooper was an employee of Youth and Family Services, who had actual knowledge of the factual basis for the allegations in the juvenile petition." Id. at ___, 646 S.E.2d at 137. Therefore, although the petition did not explicitly designate Betty Hooper as an authorized representative of the DSS director, we held that "the juvenile petition . . . contained sufficient information from which the trial court could determine that Betty Hooper had standing to initiate an action under [N.C.G.S. §] 7B-403(a)." Id. at ___, 646 S.E.2d at 137.
While Respondent contends that our holding in In re S.E.P. is dispositive, the facts in the present case are distinguishable. We agree with Respondent that Ms. Chapman likely wrote Ms. Spaulding's name on the signature line of the petition. Unlike In re S.E.P., however, Ms. Chapman also personally verified the petition in the capacity of an authorized representative of the DSS director.[1]See In re S.E.P., ___ N.C. App. at ___ n.5, 646 S.E.2d at 621 n.5. Moreover, Respondent has never contested Ms. Chapman's status as authorized representative of the director. See In re Dj.L., ___ N.C. App. at ___, 646 S.E.2d at 137. Therefore, regardless of Ms. Spaulding's viability as signator, we conclude that Ms. Chapman's signature on the petition was sufficient to satisfy the verification requirement of N.C.G.S. § 7B-403(a). See id. at ___, 646 S.E.2d at 137.
Respondent next contends the trial court lacked subject matter jurisdiction because no summons issued in the termination proceeding designated by the trial court as 06 JT 31. Respondent concedes he was served with a summons in the "entirely separate neglect adjudication case in file #94 J 251[,]" initiated by the juvenile petition filed on 3 January 2006. However, because the trial court assigned the termination proceeding a different case number, Respondent argues that it "was a totally different case." Respondent notes that a termination of parental rights proceeding may originate: (1) as a motion filed in a pending juvenile proceeding and served in accordance with N.C. Gen. Stat. § 1A-1, Rule 5(b), see N.C. Gen. Stat. § 7B-1102(b) (2005); or (2)as a petition filed to initiate a proceeding and requiring issuance and service of a summons, see N.C. Gen. Stat. § 7B-1106(a) (2005). Because the trial court assigned the termination proceeding the file number 06 JT 31, which was a different number from the previous neglect proceeding file number 94 J 251, Respondent surmises that WCHS "elected not to file a Motion in [the] ongoing proceeding and instead instituted a new juvenile proceeding solely for purposes of terminating parental rights. As such, summonses were required to be issued." Similarly, Respondent notes that no evidence supported the trial court's finding that he was served with a summons on 10 January 2006 in case number 06 JT 31.
WCHS has filed a motion to amend the record on appeal to include, inter alia,[2] an affidavit from a deputy clerk of the Wake County District Court, attesting that she "changed the file number from 94 J 251 to 06 J[T] 31" during the pendency of the neglect proceeding "in order to better comply with the North Carolina Administrative Office of the Courts' Rules of Record Keeping in juvenile cases, which require that each child be assigned a new case file number." The deputy clerk further avers that all filings related to D.W. in 94 J 251 and 06 JT 31 "are filings in the same action[]" and are included in the case file numbered 06 JT 31. Respondent objects to the motion to amend the record to include materials not before the trial court. See N.C.R. App. P. 9(a)(1)(j), (b)(5).
Because we are able to review Respondent's jurisdictional arguments upon the present record, we deny WCHS's motion to amend. The record reflects that the termination proceeding originated as a motion in the cause in the preexisting neglect proceeding instituted by WCHS's filing of the juvenile petition on 3 January 2006. See N.C. Gen. Stat. § 7B-405 (2005). A summons was issued upon WCHS's filing of the petition on 3 January 2006, and Respondent was personally served with the petition and summons on 10 January 2006. Inasmuch as D.W. was born in late 2005, and the petition was filed on 3 January 2006, it is clear that the original file number used by the trial court, 94 J 251, derived from a prior proceeding involving A.W. We note that both the petition filed on 3 January 2006 and the consent order on adjudication and disposition entered on 22 February 2006 state that "[A.W.] has a long history of substance abuse and neglect of her children (Wake County 94 J 251)."
Effective 15 February 2006, the Tenth Judicial District Juvenile Abuse/Neglect/Dependency Court Rules required the Clerk of Superior Court to
assign a separate and individual file number to each juvenile named in a petition alleging abuse, neglect, and/or dependency or in a petition to terminate parental rights in which no petition alleging abuse, neglect, and/or dependency has been filed. A juvenile will only receive one file number even if a subsequent abuse/neglect/dependency, delinquency and/or undisciplined petition is filed.
10th Jud. Dist. Juv. Abuse/Neglect/Dependency Ct. R. 14.2 (Feb. 15, 2006); see also In re M.A.I.B.K., ___ N.C. App. ___, ___, 645 S.E.2d 881, 886 (2007) (recognizing a judicial district's authority to "adopt[] local rules which govern its juvenile Family Court cases" pursuant to N.C. Gen. Stat. § 7A-146). These local rules were adopted after WCHS had filed the juvenile petition on 3 January 2006, but prior to its filing of the motion for termination of Respondent's parental rights on 29 January 2007. Because the petition had been assigned a file number, 94 J 251, used in other juvenile actions involving other children of A.W., Rule 14.2 required the clerk of court to generate a new file number unique to D.W.
The trial court relieved WCHS of further efforts toward reunification and changed D.W.'s permanent placement plan to adoption on 21 November 2006. WCHS then filed a motion for termination of parental rights on 29 January 2007. WCHS identified itself throughout the motion as "Movant" and noted that it was possessed of legal custody of D.W. "pursuant to orders of the Court in juvenile file # 94 J 251." Respondent does not deny that he was served with the motion as required by N.C.G.S. § 7B-1102(b).
At the beginning of the termination hearing, counsel for WCHS announced the following in open court:
Your Honor, this is the termination of parental rights hearing in the matter involving [D.W.] The file number is 06 JT 031. It was filed as a motion [in the] cause. Both of the parents . . . were served. The attorneys for the parents in the underlying matter obviously remained on in this matter.

(Emphasis added). Respondent offered no objection to WCHS's characterization of its filing as a motion in the cause, or to its claim that Respondent was served with the motion. Moreover, after WCHS Social Worker Jan Magri testified regarding the adjudication of neglect entered by consent on 22 February 2006, counsel for WCHS asked the trial court to take judicial notice of the "order on adjudication and disposition in the file, 06 J[T] 31." (Emphasis added). Counsel noted that "[s]ome of those documents are actually also numbered 94 J 251[,]" and that the case was originally filed in "early 2006[,]" which led to the following exchange:
THE COURT: Oh, you're saying some of the file numbers 
[WCHS COUNSEL]: Some of the file numbers may be 94 J 251; however, they're all included in the file that is now marked 
THE COURT: In the 06 J[T] 31 file. Okay.
[WCHS COUNSEL]: And we would ask that you take judicial notice of the order on adjudication and disposition.
THE COURT: Any objection?
[RESPONDENT'S COUNSEL]: No, Your Honor.
(Emphases added).
Contrary to Respondent's argument on appeal, the creation of a file number unique to D.W. did not constitute the institution of a "totally different case." The trial court's internal record-keeping protocols had no effect on the continuity of this juvenile proceeding. We find that the motion for termination of parental rights was a motion in the cause in the proceeding instituted by the petition filed on 3 January 2006. Accordingly, no second summons was required.
Respondent also contends that the evidence did not support the findings of fact upon which the trial court exercised personal jurisdiction over him. He notes the trial court found that (1) "[Respondent] was served with the Juvenile Summons . . . and Petition by personal service in 06 J[T] 031 on January 10, 2006[,]" and (2) "[Respondent] was served with the Motion to Terminate Parental Rights pursuant to Rule 5(j) of the North Carolina Rules of Civil Procedure on January 30, 2007." (Emphases added). Respondent reiterates his claim that a summons was issued in 94 J 251, but not in 06 JT 31. Respondent further observes that "Rule 5(j) is wholly non-existent and Rule 5 does not provide for service of process."
The errors assigned by Respondent provide no grounds for relief on appeal. The trial court's adoption of 06 JT 31 as the case number applicable to these proceedings is consistent with the filing system adopted by the clerk of court pursuant to the local rules enacted in February 2006. See 10th Jud. Dist. Juv. Abuse/Neglect/Dependency Ct. R. 14.2. Insofar as the trial court erred in finding that the summons issued in 06 JT 31, rather than in 94 J 251, such error was merely a clerical error. Likewise, the trial court's citation to "Rule 5(j) of the North Carolina Rules of Civil Procedure" was a non-prejudicial clerical error of no consequence to its exercise of jurisdiction. The record reflects that WCHS served a copy of the motion for termination of parental rights upon Respondent's counsel. See N.C. Gen. Stat. § 1A-1, Rule 5(b) (2005); N.C.G.S. § 7B-1102(b). Finally, Respondent waived any issues related to personal jurisdiction or WCHS's service of the motion by appearing with counsel and participating in the termination hearing. See In re D.R.S., 181 N.C. App. 136, 139-40, 638 S.E.2d 626, 628 (2007); In re B.M., 168 N.C. App. 350, 356, 607 S.E.2d 698, 702 (2005).

II.
Respondent next argues that the trial court erred by failing to appoint a guardian ad litem to represent him. The Juvenile Code provides:
On motion of any party or on the court's own motion, the court may appoint a guardian ad litem for a parent in accordance with [N.C. Gen. Stat. §] 1A-1, Rule 17, if the court determines that there is a reasonable basis to believe that the parent is incompetent or has diminished capacity and cannot adequately act in his or her own interest.
N.C. Gen. Stat. § 7B-602(c) (2005); see also N.C. Gen. Stat. § 1A-1, Rule 17 (2005). Under Rule 17, "[a] trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention, which raise a substantial question as to whether the litigant isnon compos mentis." In re J.A.A., 175 N.C. App. 66, 72, 623 S.E.2d 45, 49 (2005). "`Whether the circumstances . . . are sufficient to raise a substantial question as to the party's competency is a matter to be initially determined in the sound discretion of the trial judge.'" Id. (quoting Rutledge v. Rutledge, 10 N.C. App. 427, 432, 179 S.E.2d 163, 166 (1971)).
Respondent did not move for appointment of a guardian ad litem. Moreover, we find nothing in the record that would have required the trial court to appoint a guardian ad litem ex mero motu. The petition filed on 3 January 2006 alleged that D.W. was neglected, rather than dependent. Further, inasmuch as Respondent's paternity of D.W. and Respondent's whereabouts were unknown, the petition made no reference to Respondent's mental health. During the course of the proceedings, Respondent reported a history of alcohol abuse ending ten years earlier and also reported occasional marijuana use. He submitted to four random drug screens, all of which were negative. In a psychological evaluation performed on 24 April 2006, Dr. B. Robert Aiello found Respondent's alcohol abuse to be in full remission. Dr. Aiello also made "rule out" diagnoses of episodic marijuana use and personality disorder not otherwise specified, explaining that he was "not sure that [Respondent] met [the] criteria for establishing those diagnos[e]s[.]" Although Dr. Aiello testified that a personality disorder would impede Respondent's decision-making and ability to form stable social relationships, Dr. Aiello did not suggest that the diagnosis, if confirmed, would render Respondent legally incompetent, as contemplated by Rule 17 and N.C.G.S. § 7B-602(c). In the absence of any allegation or evidence that Respondent was non compos mentis or otherwise lacked the capacity to participate in judicial proceedings due to cognitive limitations or mental illness, we find no abuse of discretion by the trial court. See In re J.M.W., 179 N.C. App. 788, 792-95, 635 S.E.2d 916, 919-20 (2006).

III.
Respondent assigns error to the trial court's consideration of evidence that he wrote a letter to the WCHS attorney addressing the attorney as "Satan." Respondent contends that his correspondence with the WCHS attorney did not meet the standard for relevance under N.C. Gen. Stat. § 8C-1, Rule 401. Respondent further argues that the erroneous admission of this evidence was prejudicial insofar as the trial court made reference to the letter in its termination order.
Evidence of Respondent's letter was adduced during his cross-examination. Ms. Magri, the WCHS social worker, previously testified that Respondent told her on 1 June 2006 that she would "feel the pain" if Respondent did not regain custody of D.W. Ms. Magri further testified previously that Respondent "became very, very angry" during a Team Decision Making Meeting on 4 October 2006. Ms. Magri stated that Respondent's visitations were suspended based on these incidents, as well as threatening statements Respondent made to his therapist, Linda Pryor. Respondent testified that he expressed anger toward WCHS on only one single occasion during the meeting on 4 October 2006. On cross-examination, counsel for WCHS asked Respondent about a letter Respondent sent to counsel, addressing counsel as "Satan." After his objection was overruled, Respondent acknowledged sending the letter, as follows:
[WCHS COUNSEL:] Did you send this letter?
[RESPONDENT:] Yeah, I sent it. Q. Did you entitle it, "Dear Satan"?
A. "Dear Satan," yeah, that's how I wrote the letter, "Dear Satan." You have a disease in your heart. You'[re] a child thief. That's what the letter say[s], right?
Q. Do you feel that way about Wake County Human Services?
A. Yeah. Not Wake County Human Services, some elements inside of child care. . . . I feel like they're a bunch of crooks and thieves. They're selling babies under the disguise of adoption[.]
"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C. Gen. Stat. § 8C-1, Rule 611(b) (2005); see also N.C. Gen. Stat. § 8C-1, Rule 613 (2005) (allowing examination of a "witness concerning a prior statement made by him[.]"). "In North Carolina, the substantive cross-examination is not confined to the subject matter of direct testimony and impeachment. The scope of cross-examination is within the sound discretion of the trial court." State v. Syriani, 333 N.C. 350, 381, 428 S.E.2d 118, 134 (citations omitted), cert. denied, Syriani v. North Carolina, 510 U.S. 948, 126 L. Ed. 2d 341 (1993), reh'g denied, 510 U.S. 1066, 126 L. Ed. 2d 707 (1994).
We find no abuse of discretion. Respondent's letter to the WCHS attorney tended to rebut Respondent's earlier testimony that his anger toward WCHS was confined to a single incident in October 2006. The letter was also relevant to a material issue before the trial court at the termination hearing. In asserting grounds for termination under N.C.G.S. § 7B-1111(a)(2), WCHS was obliged to prove that Respondent willfully failed to make progress incorrecting the conditions which led to D.W.'s placement in foster care. Evidence of Respondent's hostility towards WCHS, which was grounded in a belief that the agency had "kidnapped" D.W. from A.W. without any justification, was probative of his willfulness in failing to comply with his case plan. See generally In re McMillon, 143 N.C. App. 402, 410, 546 S.E.2d 169, 175, disc. review denied, 354 N.C. 218, 554 S.E.2d 341 (2001) (stating that "[w]illfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort"). Accordingly, Respondent's assignments of error are overruled.

IV.
In his final argument on appeal, Respondent challenges the trial court's adjudication of grounds for termination of his parental rights under N.C.G.S. § 7B-1111(a)(1) and (2). In reviewing the adjudication, we must determine "`whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law.'" In re Shepard, 162 N.C. App. 215, 221-22, 591 S.E.2d 1, 6 (2004) (quoting In re Clark, 72 N.C. App. 118, 124, 323 S.E.2d 754, 758 (1984)). Findings which "are supported by ample, competent evidence . . . are binding on appeal, even though there may be evidence to the contrary." In re Williamson, 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1988). Whether the trial court's findings establish grounds for termination under N.C.G.S. § 7B-1111(a) is a conclusion of law fully reviewable on appeal. In re Helms, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675-76 (1997). "[W]here we determine the trial court properly concluded that one ground exists to support the termination of parental rights, we need not address the remaining grounds."In re Clark, 159 N.C. App. 75, 84, 582 S.E.2d 657, 663 (2003).
The trial court determined that Respondent had neglected D.W. under N.C.G.S. § 7B-1111(a)(1). A child is neglected if the child is denied "proper care, supervision, or discipline" or is exposed to "an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2005). Where a parent is without custody of the child at the time of the termination hearing, "a trial court may find that grounds for termination exist upon a showing of a `history of neglect by the parent and the probability of a repetition of neglect.'" In re L.O.K., 174 N.C. App. 426, 435, 621 S.E.2d 236, 242 (2005) (quoting In re Shermer, 156 N.C. App. 281, 286, 576 S.E.2d 403, 407 (2003)). Inasmuch as the issue before the trial court is the parent's fitness "at the time of the termination proceeding[,]" the trial court must consider any changed circumstances since the prior adjudication of neglect. In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (emphasis omitted).
Where a child is removed from the home soon after birth, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." In re McLean, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999). Moreover, "the trial court [has] some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside." Id. at 395, 521 S.E.2d at 126. "`[T]he fact that the parent loves or is concerned about his child'" does not preclude an adjudication of neglect under N.C.G.S. § 7B-1111(a)(1). In re Williamson, 91 N.C. App. at 674, 373 S.E.2d at 320 (quoting In re Montgomery, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984)).
As required by N.C.G.S. § 7B-1111(a)(1), the trial court concluded that Respondent had neglected D.W. and that "it is probable that there would be a repetition of the neglect if [D.W.] were returned to [Respondent's] care[.]" The trial court supported its conclusions with ninety-five findings of fact, many of which consisted of full paragraphs. Although Respondent lists thirty-three assignments of error in support of this argument, he does not expressly address any enumerated finding in the body of his argument. See In re P.M., 169 N.C. App. 423, 424, 610 S.E.2d 403, 404-05 (2005) (concluding that the respondent had abandoned factual assignments of error when she "failed to specifically argue in her brief that they were unsupported by evidence"); see also N.C.R. App. P. 28(a) (providing: "Questions raised by assignments of error . . . but not then presented and discussed in a party's brief, are deemed abandoned."); N.C.R. App. P. 28(b)(6) (stating: "Assignments of error . . . in support of which no reason or argument is stated or authority cited[] will be taken as abandoned."). Insofar as the trial court's individual findings are not contested by properly briefed assignments of error, they are "deemed to be supported by competent evidence and are conclusive on appeal." In re L.O.K., 174 N.C. App. at 428, 621 S.E.2d at 238.
In challenging the adjudication of neglect under N.C.G.S. § 7B-1111(a)(1), Respondent asserts that the trial court "made no findings of fact related to the probability of repetition of neglect by [Respondent]" and instead based its ruling on Respondent's expressions of "philosophical differences" with WCHS and his "fundamental disagreement" with the agency's assumption of custody of D.W. Respondent further contends that the trial court heard no evidence and made no findings that his actions during these proceedings posed a threat to D.W.'s well-being or had "any adverse impact" on D.W.
The trial court's findings reflect that D.W. was denied adequate prenatal care and was born with cocaine in his system. When WCHS took custody of D.W. on 3 January 2006, A.W. provided no contact information for Respondent and Respondent's whereabouts could not be determined. Although Respondent had visited D.W. in the hospital, he had not established paternity or provided for D.W.'s care. Respondent consented to an adjudication of neglect on 22 February 2006, including the conclusion that D.W. did "not receive proper care and supervision from his mother or father and reside[d] in an environment injurious to his welfare." The trial court ordered Respondent to: (1) obtain a substance abuse assessment and psychological evaluation and follow all of the recommendations; (2) cooperate with WCHS to legitimate D.W.; (3)maintain stable employment and housing; (4) attend parenting classes; (5) comply with his visitation plan; and (6) contact the child support enforcement agency and pay reasonable support.
As Respondent notes on appeal, the trial court found that Respondent: (1) obtained a substance abuse assessment and submitted four negative random drug screens; (2) obtained a psychological evaluation from Dr. Aiello; (3) attended therapy with Ms. Pryor; (4) registered for child support and made most of his monthly payments; and (5) attended most of his scheduled visits with D.W. However, Respondent fails to acknowledge the trial court's detailed findings regarding his lack of meaningful progress toward the substantial changes in his lifestyle required by his case plan and the trial court's prior orders.
Most significant was Respondent's failure to obtain stable, independent housing and employment suitable for raising D.W., as repeatedly ordered by the trial court. Based on his evaluation of Respondent, Dr. Aiello believed that the development of "good and . . . stable[] interpersonal relationships, a predictable place to live, regular employment, those kinds of things" were "prerequisites" to Respondent being able "to provide a good home for his child[.]" Dr. Aiello noted that Respondent had a history of substance abuse and transient living without strong social ties, reflecting a possible personality disorder manifesting itself in poor decision-making and consequent instability. Dr. Aiello recommended that Respondent obtain counseling to address the "decisions and steps he could take to improve [h]is stability." Dr. Aiello further averred that the incentive of reunification with D.W. should be sufficient to motivate Respondent to demonstrate the necessary changes. Dr. Aiello expected Respondent to maintain independent housing for three to six months and to maintain stable employment for one year. Respondent did not meet either of these goals. At the time of the termination hearing, Respondent continued to divide his time between his friends' residence and a homeless shelter. Respondent did not have a key or pay rent at his friends' residence and conceded that it was not a suitable environment for a child. Respondent reported only two sporadic periods of employment before obtaining a job at JOTO Masonry on 8 March 2007.
The trial court also made findings regarding Respondent's failure to address his lack of preparedness as a parent. Respondent refused to attend the court-ordered parenting classes arranged through SafeChild by his WCHS social worker, Ms. Magri. SafeChild's program coordinator, Kate French, made repeated attempts to contact Respondent in September 2006. When Respondent agreed to attend SafeChild's evening PLUS program beginning on 3 October 2006, Ms. French offered to send a taxi to drive Respondent to and from the classes. After missing the first class, Respondent informed Ms. French "that he was no longer interested in participating in the class." Respondent later told Ms. Magri that he "didn't want to go to Knightdale" for the classes.
Respondent's lack of parenting skills was evident during his visits with D.W. Social worker Kia Hart, who supervised three of Respondent's visits, described Respondent as passive and uncertain. Respondent would "hold the baby up in the air and just look at him" rather than bouncing, cuddling, or otherwise engaging D.W. Respondent looked to Ms. Hart to prepare D.W.'s bottle, change his diaper, and calm D.W. when he became upset. During a visit on 26 May 2006, Respondent held D.W. but directed his attention to Ms. Hart, "yelling and talking about the situation[.]" Ms. Magri supervised some of Respondent's visitations through October 2006, and agreed that Respondent did "not interact much at all" with D.W. but would "hold [D.W.], and wouldn't really talk to him." Ms. Magri noted that Respondent was able to feed and burp D.W. and change his diaper. Jennifer Ogle supervised Respondent's biweekly visitations after they were reinstated on 2 February 2007 until his last visit on 15 March 2007. Ms. Ogle reported that Respondent missed three scheduled visits and characterized the visits he attended as "okay." D.W. was reluctant to go to Respondent during their first two or three meetings and was teething thereafter. Respondent appeared to be frustrated but was able to change and feed D.W.
The trial court's findings also reflect the testimony of several witnesses that Respondent's hostility toward WCHS impeded him from making progress toward reunification. At the time of the hearing, Respondent continued to believe that WCHS had no grounds to take D.W. away from A.W., despite having consented to the adjudication of neglect. According to Ms. Magri, Respondent "couldn't comprehend that [A.W.] couldn't care for a baby if she was drinking all the time" and Respondent was "very resistant to the notion of why any services were needed whatsoever." Respondent refused to meet with Dr. Aiello to discuss the results of his psychological evaluation, telling Ms. Magri that he could figure out the evaluation for himself. Respondent also waited "almost six months" to begin individual therapy with Ms. Pryor and told Ms. Magri that "he didn't need [therapy] but would go[.]" Respondent would not provide his pay stubs to Ms. Magri to verify employment and "didn't understand why the judge had asked for them." Although he submitted four negative drug screens, he refused random screens "[a]t least four other times." Respondent persisted in objecting to WCHS's involvement with D.W. even though A.W. did not visit or support D.W., did not participate in her case plan, and was incarcerated at the time of the termination hearing. Respondent's threats to WCHS employees resulted in the suspension of his visitation from October 2006 to February 2007.
Respondent attended thirteen therapy sessions with Ms. Pryor between 14 July 2006 and 9 March 2007, with the goal of being "reunified with his son . . . by obtaining stable housing, stable employment and having a community support system in place[.]" Ms. Pryor testified that Respondent understood what he needed to do but "was not able to develop a plan as to how he would do any of this, nor how he would care for his child." Respondent used his therapy sessions to "blame [WCHS] for taking away his child and [to] state that they had stole[n] [D.W.]" Ms. Pryor contacted Ms. Ogle after Respondent said he "wouldn't walk the earth without his son, and he would take someone with him[.]" When asked if he was making a threat, Respondent told Ms. Pryor: "That's not a threat; it's a promise." When Respondent's visitation with D.W. was suspended due to his threatening behavior in October 2006, Ms. Pryor attempted to contact Respondent by phone to arrange his courtordered mental health assessment. Ms. Pryor did not hear from Respondent until 12 December 2006, and Respondent did not obtain the required assessment for another month. Asked how long it would take for Respondent to accomplish the goals established in therapy, Ms. Pryor testified that "he would need to stop blaming [WCHS] and would have to take responsibility for doing what needs to be done . . . so I don't know how long that would take, and I don't know whether he could do that."
The trial court also considered the evidence of progress made by Respondent just prior to the termination hearing. Respondent presented the trial court with pay stubs to show that he had been working for a masonry contractor since 8 March 2007, a period of less than six weeks. Respondent also testified that he completed parenting classes through an organization called Strengthening Black Families from December 2006 through April 2007. As the trial court found, however, Respondent did not document his attendance or make any showing that these classes addressed his particular parenting needs. See In re D.M., 171 N.C. App. 244, 248, 615 S.E.2d 669, 671, aff'd per curiam, 360 N.C. 162, 622 S.E.2d 494 (2005) (affirming termination of parental rights where the respondent failed to complete counseling prescribed by his case plan and adduced no evidence regarding the suitability of the alternative treatment he obtained). Respondent also claimed to have paid a deposit on a one-bedroom apartment on the day before the termination hearing. However, Respondent did not have a lease and did not know the apartment's street address, nor had he apprised WCHS of the apartment so as to allow an investigation of its suitability for a child. Although Respondent had discussed daycare with a provider somewhere in north Raleigh, he had no arrangement to transport D.W. to and from the daycare. We cannot say that the trial court erred in finding such last-minute, unsubstantiated efforts insufficient to rebut the evidence that Respondent had failed to demonstrate the ability to provide for the proper care and supervision of D.W., or to maintain a safe, stable home. See In re B.S.D.S., 163 N.C. App. 540, 545-46, 594 S.E.2d 89, 93 (2004).
We find the evidence and the trial court's findings of fact sufficient to support its conclusion that D.W. was likely to experience a repetition of neglect if he were placed in Respondent's care. In the fourteen months between the prior adjudication of neglect and the termination hearing, Respondent displayed love for D.W. by attending visitations and by paying child support. He also showed some willingness to perform isolated tasks such as submitting to an evaluation or attending therapy. However, Respondent was either unable or unwilling to make the necessary substantive changes to his lifestyle. The transcript reflects Respondent's repeated expressions of anger during the hearing, indicating his abiding belief that WCHS had no cause to take custody of D.W. In light of the prior adjudication of neglect and the conditions existing at the time of the termination hearing, we affirm the trial court's adjudication under N.C.G.S. § 7B-1111(a)(1). See In re L.O.K., 174 N.C. App. at 435, 621 S.E.2d at 242 (finding a likelihood of future neglect where the "respondent had a history of failing to show a positive response to counseling and educational programs[,] . . . [and the] respondent had offered uncertain evidence of stability in her working and living arrangements"); In re Davis, 116 N.C. App. 409, 413-14, 448 S.E.2d 303, 306, disc. review denied, 338 N.C. 516, 452 S.E.2d 808 (1994) (stating that "[the] [r]espondents did not attempt to correct the conditions that led to findings of neglect . . . by obtaining continued counseling, a stable home, stable employment, and parenting classes until DSS informed them termination proceedings were being pursued[.]").
Because we uphold the finding of neglect under N.C.G.S. § 7B-1111(a)(1), we need not address the second ground for termination found by the trial court under N.C.G.S. § 7B-1111(a)(2). See In re B.S.D.S., 163 N.C. App. at 546, 594 S.E.2d at 93-94.
The record on appeal includes additional assignments of error which are not addressed by Respondent in his brief to this Court. Pursuant to N.C.R. App. P. 28(b)(6), we deem them abandoned.
Affirmed.
Judges BRYANT and ARROWOOD concur.
Report per Rule 30(e).
NOTES
[1] In contrast to the "Affidavit as to Status of Minor Child[,]" the juvenile petition is not signed only on Ms. Spaulding's behalf "by" Ms. Chapman. Rather, the petition's verification includes Ms. Chapman's signature beside Ms. Spaulding's name. We find this distinction conspicuous and controlling. Ms. Chapman's signature on the juvenile petition does not reflect her intention to verify the petition for Ms. Spaulding. Rather, Ms. Chapman's signature reflects her intention to sign on her own behalf as an authorized representative of the director of WCHS. We decline to read additional language into Ms. Chapman's verification of the petition in order to defeat the trial court's subject matter jurisdiction. See N.C. Gen. Stat. § 1A-1, Rule 8(f) (2005) ("All pleadings shall be so construed as to do substantial justice."); In re Dj.L., ___ N.C. App. at ___, 646 S.E.2d at 137.
[2] WCHS also seeks to include a corrected certificate of service for the motion for termination of parental rights filed on 29 January 2007 and served on 30 January 2007, as well as an affidavit of counsel regarding his service of the motion. We find the certificate of service presently included in the record sufficient to review Respondent's assignments of error.