IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-112

 No. 37A21

 Filed 24 September 2021

 IN THE MATTER OF: M.R.J.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 30

 September 2020 by Judge Monica Bousman in District Court, Wake County. This

 matter was calendared for argument in the Supreme Court on 19 August 2021 but

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 Mary Boyce Wells for petitioner-appellee Wake County Human Services.

 Michelle FormyDuval Lynch for appellee Guardian ad Litem.

 Christopher M. Watford for respondent-appellant mother.

 MORGAN, Justice.

¶1 Respondent-mother appeals from the trial court’s order terminating her

 parental rights to “Mike,”1 a minor child born in April 2018. Because we conclude that

 the trial court had jurisdiction over the subject matter and did not abuse its discretion

 in determining Mike’s best interests, we affirm.

 I. Factual and Procedural Background

 1 We use pseudonyms to protect the identities of some of the individuals discussed in

 this opinion and for ease of reading. We note that the trial court’s order also terminated the
 parental rights of Mike’s father, whose identity is unknown.
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

¶2 In April 2018, Vance County Child Protective Services (VCCPS) received a

 report that Mike and his twin brother had tested positive for methadone and

 marijuana at birth. While VCCPS was assessing the family on 10 June 2018, the

 agency received a second report on the family that Mike’s twin brother had died in

 respondent-mother’s home. Respondent-mother stated that she had placed both

 children on a bed and later found the deceased child unresponsive.

¶3 On 10 June 2018, VCCPS placed Mike with Theresa R., an approved safety

 resource who lived in Wake County. The family was found to be in need of services,

 and the case was transferred from VCCPS to Wake County Human Services (WCHS)

 in August 2018.

¶4 A WCHS social worker scheduled a home visit with respondent-mother and

 Theresa R. for the afternoon of 15 October 2018. When the social worker arrived at

 the residence, Theresa R. reported that respondent-mother had removed Mike from

 the home on the previous day of 14 October 2018, claiming that respondent-mother

 was taking Mike to live with his maternal grandmother in South Carolina.

 Respondent-mother confirmed to the social worker on 15 October 2018 that she “sent”

 Mike to South Carolina to live with his maternal grandmother.

¶5 On 31 October 2018, the WCHS social worker visited respondent-mother at the

 Wake County Detention Center where respondent-mother was being held for

 violating her probation. Respondent-mother agreed to contact the social worker after
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 her release from jail but failed to do so.

¶6 WCHS was unaware of respondent-mother’s whereabouts after her release

 from incarceration until 2 January 2019, when the social worker learned that

 respondent-mother was hospitalized at UNC Hospital with an infection. WCHS

 contacted respondent-mother and established a safety plan for Mike, pursuant to

 which he would continue to reside with the maternal grandmother in South Carolina.

 On the following day of 3 January 2019, respondent-mother gave the name of a friend

 of hers in Vance County to the social worker and asked for the friend to be considered

 as a placement for Mike. VCCPS conducted a home study of respondent-mother’s

 recommended friend on behalf of WCHS but did not approve the friend as a

 placement.

¶7 On 16 January 2019, a safety assessment was performed on the maternal

 grandmother’s home by Fairfield County, South Carolina, CPS. The grandmother’s

 residence was approved for Mike’s placement. Respondent-mother identified for

 WCHS another friend, Donna W., as a potential placement option for respondent-

 mother’s children. On 30 January 2019, WCHS approved Donna W.’s home as a

 placement for Mike’s older half-brother.

¶8 Respondent-mother was released from UNC Hospital on 1 February 2019, but

 she failed to respond to repeated telephone calls from WCHS social workers. On 8

 February 2019, the maternal grandmother brought Mike to Wake County to visit
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 respondent-mother, after obtaining the approval of WCHS for Mike to stay overnight

 in Donna W.’s home. WCHS informed Donna W. and the maternal grandmother that

 Mike was to return to South Carolina on 10 February 2019.

¶9 The maternal grandmother reported that respondent-mother was incoherent

 and falling asleep during a supervised visit with Mike on 10 February 2019. On the

 next day of 11 February 2019, respondent-mother contacted law enforcement in Wake

 County and reported that Mike was with the maternal grandmother and that the

 maternal grandmother had been drinking alcohol. Multiple police units and a

 helicopter responded to the call. Officers detained the maternal grandmother and

 contacted WCHS, which confirmed that Mike was legally placed with the maternal

 grandmother and that she had not been drinking. Respondent-mother then sent

 numerous text messages to the WCHS social worker on 11 February 2019,

 threatening to remove Mike from his placement with the maternal grandmother and

 reminding the social worker that respondent-mother still had legal custody of the

 child.

¶ 10 On 13 February 2019, WCHS filed a juvenile petition alleging that Mike was

 neglected. The petition stated that respondent-mother “is reportedly still actively

 using heroin and is without stable housing” and that she “has not been compliant

 with any recommended services” or treatment to address her substance abuse and

 mental health issues. WCHS further alleged that respondent-mother “continues to
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 sabotage” Mike’s placement with the maternal grandmother, “has not been willing to

 allow [Mike] to remain in a stable placement[,]” and “has a history of becoming upset

 with kinship providers/temporary safety providers and immediately removing the

 children from the home.”

¶ 11 Based on the petition’s verified allegations, the trial court granted nonsecure

 custody of Mike to WCHS on 13 February 2019. On 14 February 2019, Mike joined

 his older half-brother in a fictive kinship placement with Donna W. in Wake County.

¶ 12 The trial court conducted a hearing on the petition on 9 May 2019. Based on a

 written stipulation of facts signed by the parties, the trial court adjudicated Mike to

 be a neglected juvenile in that he “do[es] not receive proper care and supervision from

 [his] parents and live[s] in an environment injurious to [his] welfare.” See N.C.G.S. §

 7B-101(15) (2019). The trial court kept Mike in WCHS custody and awarded weekly

 supervised visitation with the child to respondent-mother. Mike remained in his

 placement with Donna W.

¶ 13 In addition to the aforementioned facts, the trial court found as follows:

 30. The mother submitted to a substance abuse
 assessment and [was] diagnosed with Opiate Use Disorder
 Severe and given specific recommendations. She is using
 amounts of Heroin that are life threatening and needs to
 go into drug detoxification immediately . . . .

 31. The mother is not in[ ]compliance with the terms
 and conditions of her probation and has stated that she is
 not visiting [Mike] because she is afraid of being arrested
 ....
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 32. The mother reports diagnoses of Bi-Polar Disorder
 and Personality Disorder . . . .

 The trial court ordered respondent-mother to comply with her Out-of-Home Family

 Services Agreement (OHFSA) by immediately entering drug detoxification;

 participating in intensive outpatient drug treatment; refraining from the use of

 impairing substances; submitting to random drug screens; obtaining a psychiatric

 evaluation; obtaining a psychological evaluation and following any recommendations;

 refraining from criminal activity and complying with the conditions of her probation;

 participating in parenting classes and demonstrating learned parenting skills;

 obtaining and maintaining stable and appropriate housing and income; maintaining

 regular contact with the WCHS social worker; and regularly attending visitations.

¶ 14 The trial court held a permanency planning hearing on 5 August 2019 and

 entered an order on 19 September 2019 establishing a primary permanent plan of

 reunification with a secondary plan of adoption. The trial court found that

 respondent-mother had not maintained regular contact with the social worker or

 documented respondent-mother’s completion of any court-ordered services.

 Respondent-mother had been incarcerated in the Vance County Jail through mid-

 July 2019, had additional pending charges in Wake and Franklin Counties, and had

 not visited with Mike since March 2019. The trial court concluded that respondent-

 mother “continues to act in a manner inconsistent with her [c]onstitutionally

 protected status as a parent . . . .”
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

¶ 15 At the next permanency planning hearing, in an order entered on 9 March

 2020, the trial court changed Mike’s primary permanent plan to adoption with a

 secondary plan of reunification. With regard to the requirements of her OHFSA, the

 trial court found that respondent-mother had failed to respond to the social worker’s

 telephone calls, text messages, emails, or letters; was jailed in Vance County in

 January 2020 for violating her probation and resisting a public officer; had failed to

 comply with the recommendations of her substance abuse assessment; had failed to

 submit to any requested drug screens; had failed to attend a scheduled psychological

 evaluation or to reschedule the appointment; was discharged by her parenting coach

 for lack of communication and general noncompliance; and had failed to attend any

 visitations with Mike. The trial court determined that further efforts to reunify Mike

 with respondent-mother “clearly would be unsuccessful or inconsistent with [his]

 health or safety and need for a safe, permanent home within a reasonable time.” See

 N.C.G.S. § 7B-906.2(b) (2019).

¶ 16 On 12 March 2020, WCHS filed a motion to terminate respondent-mother’s

 parental rights to Mike. The trial court held a hearing on the motion on 10 July and

 3 August 2020 and entered its “Order Terminating Parental Rights” on 30 September

 2020. As grounds for termination, the trial court established that respondent-mother

 previously neglected Mike and was likely to subject him to further neglect if he was

 returned to her care, see N.C.G.S. § 7B-1111(a)(1) (2019), and that respondent-mother
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 willfully left Mike in an out-of-home placement for more than twelve months without

 making reasonable progress to correct the conditions leading to his removal, see

 N.C.G.S. § 7B-1111(a)(2). The trial court concluded that it was in Mike’s best interests

 for the parental rights of respondent-mother to be terminated. See N.C.G.S. § 7B-

 1110(a) (2019).

¶ 17 Respondent-mother filed timely notice of appeal from the order terminating

 her parental rights.

 II. Respondent-Mother’s Arguments on Appeal

 A. Subject Matter Jurisdiction

¶ 18 Respondent-mother first claims that the trial court was without jurisdiction to

 enter the order terminating respondent-mother’s parental rights because WCHS

 lacked standing to initiate the termination proceeding under N.C.G.S. § 7B-1103(a)

 (2019).

¶ 19 “Whether or not a trial court possesses subject-matter jurisdiction is a question

 of law that is reviewed de novo. Challenges to a trial court’s subject-matter

 jurisdiction may be raised at any stage of proceedings, including for the first time

 before this Court.” In re A.L.L., 376 N.C. 99, 101 (2020) (extraneity omitted).

 However, “[t]his Court presumes the trial court has properly exercised jurisdiction

 unless the party challenging jurisdiction meets its burden of showing otherwise.”

 In re L.T., 374 N.C. 567, 569 (2020).
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

¶ 20 The statute that confers subject matter jurisdiction over termination of

 parental rights proceedings provides as follows:

 The court shall have exclusive original jurisdiction to hear
 and determine any petition or motion relating to
 termination of parental rights to any juvenile who resides
 in, is found in, or is in the legal or actual custody of a county
 department of social services or licensed child-placing
 agency in the district at the time of filing of the petition or
 motion. . . . Provided, that before exercising jurisdiction
 under this Article, the court shall find that it has
 jurisdiction to make a child-custody determination under
 the provisions of G.S. 50A-201, 50A-203, or 50A-204.

 N.C.G.S. § 7B-1101 (2019). The Juvenile Code defines “[c]ourt” as “[t]he district court

 division of the General Court of Justice.” N.C.G.S. § 7B-101(6) (2019).

¶ 21 Respondent-mother does not claim that the District Court, Wake County failed

 to meet the general jurisdictional requirements of N.C.G.S. § 7B-1101; she instead

 contends that WCHS lacked standing under N.C.G.S. § 7B-1109(a) to initiate the

 termination proceeding in this case. Respondent-mother’s argument is well

 summarized by the Court of Appeals opinion in In re E.X.J.:

 Under N.C.[G.S.] § 7B-1103(a)(3) (20[19]), a petition or
 motion to terminate the parental rights of a parent may be
 filed by a “county department of social services . . . to whom
 custody of the juvenile has been given by a court of
 competent jurisdiction.” If DSS does not lawfully have
 custody of the children, then it lacks standing to file a
 petition or motion to terminate parental rights, and the
 trial court, as a result, lacks subject matter jurisdiction.

 In re E.X.J., 191 N.C. App. 34, 39 (2008) (ellipsis in original), aff’d per curiam, 363
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 N.C. 9 (2009).

¶ 22 Respondent-mother contends that WCHS was not “a proper party” authorized

 to file the petition which alleged that Mike was neglected in February 2019. She

 opines that Mike was a resident of South Carolina when the petition was filed and

 when the District Court, Wake County purported to grant nonsecure custody of the

 child to WCHS on 13 February 2019. Respondent-mother also contends that the

 petition filed by WCHS “fail[ed] to establish that [her] legal residence was in Wake

 County.” As a result, “because the [WCHS] director had no authority over a child

 whose legal residence was in South Carolina, the petition was void for lack of subject

 matter jurisdiction[,]” and “the initial order granting nonsecure [custody] was

 invalid[.]” Respondent-mother consequently reasons that the District Court, Wake

 County was not “a court of competent jurisdiction” when it awarded WCHS custody

 of Mike, and WCHS “lacked standing to move for the termination of [respondent-

 mother’s] parental rights” under N.C.G.S. § 7B-1103(a)(3).

¶ 23 “North Carolina district courts have ‘exclusive, original [subject matter]

 jurisdiction over any case involving a juvenile who is alleged to be abused, neglected,

 or dependent.’ ” In re E.X.J., 191 N.C. App. at 47 (alteration in original) (quoting

 N.C.G.S. § 7B-200 (2005)). “A trial court’s subject matter jurisdiction over all stages

 of a juvenile case is established when the action is initiated with the filing of a

 properly verified petition.” In re T.R.P., 360 N.C. 588, 593 (2006). Under N.C.G.S.
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 § 7B-401.1(a), “[o]nly a county director of social services or the director’s authorized

 representative may file a petition alleging that a juvenile is abused, neglected, or

 dependent.” N.C.G.S. § 7B-401.1(a) (2019).

¶ 24 In interpreting N.C.G.S. § 7B-401.1(a), respondent-mother notes that N.C.G.S.

 § 7B-101(10) defines “Director” as “the director of the department of social services in

 the county in which the juvenile resides or is found, or the director’s representative

 . . . .” She then points to N.C.G.S. § 153A-257(a) (2019), which allocates the

 responsibility for providing social services among the state’s local social services

 agencies based on the recipient’s county of residence. “Read in paria materi [sic],”

 respondent-mother argues that “both of these statutes are meant to identify the

 director, if any, who is responsible for providing a service, such as filing a juvenile

 petition, and both unquestionably tie that identification to location.”

¶ 25 Based on her reading of the statutes, respondent-mother asserts that

 [t]he director of Wake County, and by extension, any
 authorized representative, was without statutory
 authority to file the juvenile petition in this matter. It is
 undisputed that [Mike] resided in South Carolina with his
 grandmother for 131 days including the day of the filing of
 the Petition. It is undisputed that [respondent-mother’s]
 actual location was unknown and that Wake County made
 no representation as to where they believed her to reside.
 No document indicates that the child “was found in” Wake
 County prior to anytime before the filing of the petition.
 Thus, under both G.S. § 7B-101 and G.S. § 153A-247, Wake
 County has no authority over Mike at the time of filing.

¶ 26 Respondent-mother’s positions are inconsistent with the factual record before
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 this Court. Moreover, her legal arguments appear to address the issue of venue and

 thus do not implicate the trial court’s subject matter jurisdiction to place Mike in

 WCHS custody.

¶ 27 We have previously considered and rejected the claim that the definition of

 “Director” found in N.C.G.S. § 7B-101(10) imposes a geographical limit on which

 “county director” may invoke the trial court’s subject matter jurisdiction by filing a

 juvenile petition under N.C.G.S. § 7B-401.1(a). Regarding this circumstance, this

 Court has stated:

 Because the language of section 7B-401.1(a) identifies ‘‘a
 county director of social services’’ as the proper petitioner
 in a juvenile adjudication action rather than ‘‘the director’’
 (importing the definition from N.C.G.S. § 7B-101(10)) or
 similar language singling out particular directors, we hold
 that the legislature did not intend to limit the class of
 parties who may invoke the court’s subject matter
 jurisdiction in juvenile adjudication actions to only
 directors of county departments of social services in the
 county where the juvenile at issue resides or is found.

 In re A.P., 371 N.C. 14, 20 (2018). Nor does N.C.G.S. § 153A-257(a) purport to limit

 the trial court’s subject matter jurisdiction in juvenile abuse, neglect, and dependency

 cases.2

 2 Respondent-mother attempts to replace the requirement of the trial court’s subject

 matter jurisdiction with a novel concept of a petitioner’s subject matter jurisdiction, arguing
 that “because the [WCHS] director had no authority over a child whose legal residence was
 in South Carolina, the petition was void for lack of subject matter jurisdiction.” (Emphasis
 added).
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

¶ 28 The question of which county director of social services is sanctioned to file a

 juvenile petition is answered by the venue statute N.C.G.S. § 7B-400, which provides:

 A proceeding in which a juvenile is alleged to be abused,
 neglected, or dependent may be commenced in the judicial
 district in which the juvenile resides or is present at the
 time the petition is filed. . . . Notwithstanding G.S. 153A-
 257, the absence of a juvenile from the juvenile’s home
 pursuant to a protection plan during an assessment or the
 provision of case management services by a department of
 social services shall not change the original venue if it
 subsequently becomes necessary to file a juvenile petition.

 N.C.G.S. § 7B-400(a) (2019).

¶ 29 “Improper venue is not jurisdictional, and it is subject to waiver.” Stokes v.

 Stokes, 371 N.C. 770, 773 (2018) (emphasis added). Unlike the issue of subject matter

 jurisdiction, which may be raised at any time, an objection to improper venue is

 waived if not “taken in apt time” in the trial court. McMinn v. Hamilton, 77 N.C. 300,

 301 (1877); see also N.C.G.S. § 1A-1, Rule 12(h)(1) (“A defense of . . . improper venue

 . . . is waived (i) if omitted from a motion [made under Rule 12], or (ii) if it is neither

 made by motion under this rule nor included in a responsive pleading or an

 amendment thereof permitted by Rule 15(a) to be made as a matter of course.”).

 Because respondent-mother made no claim of improper venue at any time in the trial

 court while this matter was pending in the lower forum, the issue of venue is waived

 and therefore is not properly before this Court. See N.C. R. App. P. 10(a)(1).

¶ 30 Moreover, contrary to respondent-mother’s characterization, the record
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

demonstrates that Wake County is a proper venue for the juvenile proceeding

initiated on 13 February 2019. The verified petition filed by WCHS expressly alleged

that Mike “resides in the district at the address shown below, was found in the district

as alleged herein, or venue exists pursuant to G.S. 7B-400(a) or (b).” Although the

petition did not list respondent-mother’s street address, it identified her as “a citizen

and resident of Wake County, North Carolina[.]”3 The petition further averred—and

respondent-mother subsequently stipulated—that Mike was living in South Carolina

with his maternal grandmother pursuant to a safety plan that WCHS established

with respondent-mother on 2 January 2019. See N.C.G.S. § 7B-400(a) (“[T]he absence

of a juvenile from the juvenile’s home pursuant to a protection plan during an

assessment or the provision of case management services by a department of social

services shall not change the original venue if it subsequently becomes necessary to

file a juvenile petition.”). Finally, the petition’s allegations—and the parties’ signed

stipulations entered on 8 May 2019—indicated that Mike was visiting Wake County

with his grandmother and was therefore “present” in the county at the time that

 3 Respondent-mother later stipulated that she was “a citizen and resident of
Henderson, North Carolina[.]” Although Henderson is located in Vance County rather than
Wake County, North Carolina, this potential discrepancy had no effect on the trial court’s
subject matter jurisdiction. See generally In re A.P., 371 N.C. at 20 (“hold[ing] that the
legislature did not intend to limit the class of parties who may invoke the court’s subject
matter jurisdiction in juvenile adjudication actions to only directors of county departments
of social services in the county where the juvenile at issue resides or is found.”). Moreover,
since it is unclear from the record here, there is the prospect that respondent-mother was a
Wake County resident when WCHS filed its petition in February 2019 yet was a Vance
County resident when she signed the stipulation in March or May of 2019.
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 WCHS filed the petition on 13 February 2019.4 N.C.G.S. § 7B-400(a) (allowing

 proceeding to “be commenced in the judicial district in which the juvenile resides or

 is present at the time the petition is filed”).

¶ 31 Respondent-mother also frames her challenge to the trial court’s jurisdiction

 in terms of the statutory requirement that a juvenile petition be verified pursuant to

 N.C.G.S. § 7B-403(a) by the “county director of social services or the director’s

 authorized representative[.]” N.C.G.S. § 7B-401.1(a); see also N.C.G.S. § 7B-403(a)

 (“[T]he petition shall be drawn by the director, verified before an official authorized

 to administer oaths, and filed by the clerk . . . .” (emphasis added)). In doing so,

 respondent-mother quotes our opinion in In re T.R.P. for the principle that “[a] trial

 court’s subject matter jurisdiction over all stages of a juvenile case is established

 when the action is initiated with the filing of a properly verified petition.” In re T.R.P.,

 360 N.C. at 593 (emphasis added). She goes on to contend that, in the present case,

 “[t]he initial juvenile petition seeking custody of Mike was improperly verified and

 thus did not grant the court subject matter jurisdiction to issue the initial non-secure

 4 The petition and the parties’ stipulations describe the maternal grandmother’s
 attainment of WCHS’s approval to visit Wake County with Mike on 8 February 2019 and “to
 stay overnight at the home of Mrs. Donna W[.] during [the] visit.” Although Mike and his
 grandmother “were to return to South Carolina . . . on Sunday, February 10, 2019[,]” they
 remained in Wake County at least through 11 February 2019, when respondent-mother
 called the police and reported that Mike was with his maternal grandmother who had been
 drinking. “Wake County police . . . responded and detained [the maternal grandmother] until
 they got in contact with [WCHS] After [H]ours who assisted with ensuring that [Mike was]
 legally placed in the care of [the grandmother] and [she] had not been drinking[.]”
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 custody order on 13 February 2019.” (Emphasis added).

¶ 32 In In re T.R.P., this Court held that the Wilkes County Department of Social

 Services’ “failure to verify [its] juvenile petition is a fatal defect” depriving the trial

 court of subject matter jurisdiction. 360 N.C. at 598. We noted that, “[a]lthough the

 juvenile petition setting forth these allegations [of neglect] was notarized, it was

 neither signed nor verified by the Director of WCDSS or any authorized

 representative thereof.” Id. at 589. Other cases cited by respondent-mother likewise

 involved a petitioner’s failure to verify its petition in accordance with N.C.G.S. § 7B-

 403(a). See In re S.E.P., 184 N.C. App. 481, 487 (2007) (“Neither the 26 September

 2002 adjudication petition nor the 8 April 2004 amended petition conferred subject

 matter jurisdiction upon the trial court” because (1) “the alleged signature which

 appears on the [original] petition was not in fact the director’s signature[,]” and (2)

 “[t]he verification section of the amended petition shows no signature in the

 ‘Signature of Petitioner’ space.”); In re A.J.H-R., 184 N.C. App. 177, 180 (2007)

 (concluding that the trial court “lacked subject matter jurisdiction to adjudicate this

 matter” where the juvenile neglect petitions were “neither signed nor verified” by the

 agency’s director or his authorized representative).

¶ 33 In the instant case, the petition filed by WCHS was properly verified before a

 notary by social worker Martheia Capel, acting as the authorized representative of

 WCHS Director Regina Petteway, thereby satisfying the verification requirement in
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 N.C.G.S. § 7B-403(a). Given this obvious distinction, respondent-mother’s reliance on

 In re T.R.P. and similar cases is misplaced and unavailing. See In re T.R.P., 360 N.C.

 at 589 (“Although the juvenile petition . . . was notarized, it was neither signed nor

 verified by the Director of WCDSS or any authorized representative thereof.”).

¶ 34 Having addressed respondent-mother’s arguments challenging the trial court’s

 subject matter jurisdiction, we next consider whether the trial court properly

 exercised its recognized jurisdiction in light of the fact that Mike was living in South

 Carolina with his maternal grandmother at the time that the petition was filed. We

 conclude that the trial court had such jurisdiction.

¶ 35 In North Carolina, the issue of whether the courts of a particular state have

 jurisdiction over a proceeding which affects child custody is governed by the Uniform

 Child-Custody Jurisdiction and Enforcement Act (UCCJEA), specifically the

 provisions of Article 2, Part 2 as codified in N.C.G.S. §§ 50A-201 through -210 (2019).

 See, e.g., N.C.G.S. § 7B-1101 (“[B]efore exercising jurisdiction under this Article, the

 court shall find that it has jurisdiction to make a child-custody determination under

 the provisions of G.S. 50A-201, 50A-203, or 50A-204.”). “The trial court must comply

 with the UCCJEA in order to have subject matter jurisdiction over juvenile abuse,

 neglect, and dependency cases and termination of parental rights cases.” In re L.T.,

 374 N.C. at 569. Although respondent-mother makes no mention of these statutes,

 nonetheless the scope of the trial court’s subject matter jurisdiction here, and the
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 extent to which it is impacted—if at all—by the availability of the courts of South

 Carolina, is properly determined by consulting the applicable provisions of this

 enactment.

¶ 36 Under the UCCJEA,

 [g]enerally, North Carolina courts have jurisdiction to
 make a child custody determination if North Carolina is
 the home state of the child. N.C.G.S. § 50A-201(a)(1).
 “ ‘Home state’ means the state in which a child lived with
 a parent or a person acting as a parent for at least six
 consecutive months immediately before the
 commencement of a child-custody proceeding.” N.C.G.S.
 § 50A-102(7) (2017). If a court of another state has home
 state jurisdiction, North Carolina courts do not have
 jurisdiction unless one of several statutory exceptions
 applies.

 In re S.E., 373 N.C. 360, 364 (2020).

¶ 37 Respondent-mother observes that “[i]t is undisputed that [Mike] resided in

 South Carolina with his grandmother for 131 days including the day of the filing of

 the Petition” on 13 February 2019. Because 131 days is less than the six consecutive

 months required by N.C.G.S. § 50A-102(7) for home state recognition, South Carolina

 is not Mike’s home state for jurisdictional purposes under the UCCJEA. Furthermore,

 as the guardian ad litem correctly notes, Mike was born in late April of 2018 and

 therefore had not been alive for a full six months at the time that he left North

 Carolina to live with his maternal grandmother in South Carolina on 15 October

 2018. We agree with the contention that Mike had no home state under the UCCJEA,
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 because (1) Mike had not lived in any state for at least six consecutive months prior

 to the petition being filed, and (2) although Mike was less than six months of age, he

 had not lived from birth in any one state with a parent or person acting as a parent.

 N.C.G.S. § 50A-102(7).

¶ 38 Also, the UCCJEA provides, due to North Carolina’s adoption of it, that “a

 court of this State has jurisdiction to make an initial child custody determination” in

 the following circumstances:

 a. The child and the child’s parents, or the child and at least
 one parent or a person acting as a parent, have a significant
 connection with this State other than mere physical
 presence; and

 b. Substantial evidence is available in this State
 concerning the child’s care, protection, training, and
 personal relationships[.]

 N.C.G.S. § 50A-201(a)(2) (2019). “The trial court is not required to make specific

 findings of fact demonstrating its jurisdiction under the UCCJEA, but the record

 must reflect that the jurisdictional prerequisites in the Act were satisfied when the

 court exercised jurisdiction.” In re L.T., 374 N.C. at 569.

¶ 39 The record in the case sub judice illustrates that both Mike and respondent-

 mother had a significant connection with North Carolina beyond their mere presence

 in the state at the time WCHS filed its petition on 13 February 2019. See N.C.G.S.

 § 50A-201(a)(2)(a). Respondent-mother had been a North Carolina resident at least

 since Mike’s birth and had a CPS history in both Vance and Wake Counties. M.T.,
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 one of respondent-mother’s older children, and two of respondent-mother’s safety

 resources, Theresa R. and Donna W., were also North Carolina residents.

 Respondent-mother was also on probation in North Carolina and had additional

 criminal charges pending. Mike was born in North Carolina and lived in the state

 before he was taken to South Carolina to live with his maternal grandmother on 15

 October 2018. Mike’s mother and an older sibling continued to reside in North

 Carolina at the time that the petition was filed.

¶ 40 The record further reflects that substantial evidence was available in North

 Carolina regarding Mike’s care and family history at the time that the petition was

 filed. See N.C.G.S. § 50A-201(a)(2)(b). Respondent-mother, Theresa R., and Donna W.

 were all located in North Carolina, and so were (1) the hospital where Mike was born

 and where Mike tested positive for methadone and marijuana, (2) two child protective

 services agencies that investigated, and consistently provided services to, the family

 since Mike’s birth, and (3) the police department that responded to respondent-

 mother’s false report of Mike’s abduction by his maternal grandmother on 11

 February 2019. Therefore, the District Court, Wake County properly exercised

 “significant connection” jurisdiction under the UCCJEA.

¶ 41 We conclude that the trial court possessed subject matter jurisdiction over the

 juvenile petition filed by WCHS on 13 February 2019. The trial court thereupon

 entered its orders placing Mike in WCHS custody in the trial court’s capacity as “a
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 court of competent jurisdiction.” N.C.G.S. § 7B-1103(a)(3). Accordingly, WCHS had

 standing under N.C.G.S. § 7B-1103(a)(3) to file its motion to terminate respondent-

 mother’s parental rights on 12 March 2020 and the trial court had jurisdiction to

 issue the termination of parental rights order.

 B. Best Interests Determination

¶ 42 Respondent-mother contends that the trial court abused its discretion at the

 dispositional stage of the proceeding by determining that it was in Mike’s best

 interests to terminate her parental rights. Respondent-mother argues that the trial

 court did not need to terminate her parental rights because respondent-mother had

 already executed a conditional relinquishment or “specific relinquishment” of her

 rights authorizing Mike to be adopted by her sister and brother-in-law (the

 Petersons).5 Respondent-mother asserts that the trial court mistakenly believed that

 terminating her parental rights was necessary to provide Mike with legal protections

 beyond those which were conferred by her relinquishment.

¶ 43 Under N.C.G.S. § 7B-1110(a), if the trial court adjudicates the existence of one

 or more statutory grounds for terminating a respondent-parent’s rights,

 it proceeds to the dispositional stage where it must
 “determine whether terminating the parent’s rights is in

 5 Although respondent-mother posits that the termination order effectively
 “terminated parental rights of a parent that did not exist[,]” she asserts that her appeal is
 not moot because the order may result in adverse collateral consequences to her “including[,]
 but not limited to, a potential termination of parental rights to future children under
 [N.C.]G.S. § 7B-1111(a)(9) [(2019)].”
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 the juvenile’s best interest” based on the following factors:

 (1) The age of the juvenile.

 (2) The likelihood of adoption of the juvenile.

 (3) Whether the termination of parental
 rights will aid in the accomplishment of the
 permanent plan for the juvenile.

 (4) The bond between the juvenile and the
 parent.

 (5) The quality of the relationship between
 the juvenile and the proposed adoptive
 parent, guardian, custodian, or other
 permanent placement.

 (6) Any relevant consideration.

 In re J.J.B., 374 N.C. 787, 791 (2020) (quoting N.C.G.S. § 7B-1110(a)).

¶ 44 The trial court’s determination of a juvenile’s best interests under N.C.G.S.

 § 7B-1110(a) is reviewed only for abuse of discretion. In re B.E., 375 N.C. 730, 745

 (2020). “Under this standard, we defer to the trial court’s decision unless it is

 ‘manifestly unsupported by reason or one so arbitrary that it could not have been the

 result of a reasoned decision.’ ” Id. at 745 (quoting In re J.J.B., 374 N.C. at 791). An

 abuse of discretion may occur if the trial court bases its best interests determination

 on a misunderstanding of the relevant law. Id.

¶ 45 Although she did not produce such a document in court, respondent-mother

 adduced testimony at the dispositional hearing that she executed a relinquishment
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

of her parental rights to Mike on 10 July 2020, conditioned upon his adoption by the

Petersons. See N.C.G.S. § 48-3-704 (2019). The trial court made the following findings

of fact related to the dispositional criteria in N.C.G.S. § 7B-1110(a):

 32. The primary permanent plan for the child is
 adoption and termination of the parents’ parental rights
 will aid in the accomplishment of the primary permanent
 [plan].

 33. The child is 2 years of age. He is young and healthy
 and has no developmental issues that are likely to be a
 barrier to adoption.

 34. . . . The child has been out of the care of the mother
 since he was approximately 38 days old. He has had limited
 and inconsistent contact with the mother since that time.
 He does not have a substantial parent-child relationship
 with the mother.

 35. The child was placed in the home of [Donna W. and
 her husband] as requested by the mother when he came
 into foster care. He has remained in that home since that
 time. His needs are being met in the home and they are
 willing to adopt the child. He has developed a strong,
 appropriate parent-child bond with them. He is happy and
 healthy. He looks to them for comfort, and accepts
 discipline from them.

 36. The mother has a sister and brother in law (“the
 [Petersons]”) in South Carolina [who] submitted to an
 ICPC home study for possible placement of the child. They
 would also be willing to adopt the child. The ICPC home
 study was positive. The [Petersons] and the child have had
 a few visits since February, 2020. The child does not have
 a parental bond with the [Petersons] at the present time
 but he has the ability to . . . bond with caregivers and could
 bond with them if they are chosen to adopt him.

 37. The child’s young age and availability of at least two
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 families that are committed to adopting him indicates
 [there] is a high probability that this child will be adopted.
 He is in need of a permanent plan of care at the earliest
 possible age which can be obtained only by the severing of
 the relationship between the child and his parents by
 termination of the parental rights of the parents.

 As respondent-mother does not contest these findings, they are binding on appeal. In

 re A.M.O., 375 N.C. 717, 720 (2020).

¶ 46 In support of her claim that the trial court acted under a misapprehension of

 law, respondent-mother points to the trial court’s statement in open court which

 expressed concern that Mike might be left without a permanent placement for an

 extended period of time if the trial court did not elect to terminate respondent-

 mother’s parental rights and the Petersons were subsequently unable to adopt the

 child:

 [Counsel for respondent-mother] makes a very valid point
 that if I did not find [terminating respondent-mother’s
 parental rights] was in [Mike’s] best interest that the
 mother’s already signed relinquishments and that the
 [Petersons] could -- could just then adopt him. We all know
 that things happen that none of us plan. Something may
 happen in the future that even if the [Petersons] were
 chosen to be the adoptive parents, it could be that
 something would happen to them. And I am not wishing
 anybody any bad luck. Believe me. But -- but things
 happen.

 Af -- after presiding in this courtroom for seventeen and a
 half years, I am very well aware of things that happened
 that interrupt the adoption process. And that is not in
 [Mike’s] best interest. And then we would be right back
 where we would -- where -- where we are right now a year
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 from now, two years from now, or something like that, and
 [Mike] still would not have permanence if the [Petersons]
 were unable to adopt him and if I found that it wasn’t in
 his best interest.

¶ 47 Respondent-mother asserts that “it is very possible that Mike can find

 permanence through adoption with the [Petersons],” and that, even if the Petersons

 were ultimately granted guardianship of Mike in lieu of adoption, “that too is a

 permanency outcome which does not mandate the termination of [her] parental

 rights.” She notes that the trial court made no findings explaining “what conditions

 might be encountered that would interrupt the [Petersons’] adoption process, or

 somehow stall permanence for Mike.” Moreover, notwithstanding the trial court’s

 articulated concerns, respondent-mother argues that the trial court erred in believing

 that it was necessary to terminate respondent-mother’s parental rights in order to

 provide permanency for Mike. She suggests that the trial court could have “held open

 a decision as to [her parental rights] to see if Mike actually found permanence with

 the [Petersons].”

¶ 48 Respondent-mother’s argument is unpersuasive. Assuming that respondent-

 mother did, in fact, execute a valid specific relinquishment of her parental rights to

 Mike expressly to facilitate Mike’s adoption by the Petersons, the adoption statutes

 permit her to revoke her relinquishment if, for whatever reason, the Petersons did
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 not adopt Mike.6 See N.C.G.S. §§ 48-3-704, -707(b) (2019). Irrespective of the

 Petersons’ willingness or ability to adopt the child, respondent-mother was also free

 to challenge the relinquishment at any time prior to entry of the adoption decree on

 the ground that the relinquishment was “obtained by fraud or duress.” N.C.G.S. § 48-

 3-707(a)(1) (2019). In either case, Mike would be needlessly denied permanence for

 some period of time. See N.C.G.S. § 48-3-707(c). The trial court’s recognition of

 potential hindrances, whether general or specific, to the realization of Mike’s primary

 permanent plan of adoption does not reflect either a misapprehension of the law or

 an abuse of discretion in the trial court’s contemplation here of the juvenile’s best

 interests.

¶ 49 By terminating respondent-mother’s parental rights, the trial court facilitated

 Mike’s adoption by the Petersons, by Donna W. and her husband—who had already

 developed “a strong, appropriate parent-child bond” with the child—and by any other

 adoptive parents identified and approved by WCHS. Respondent-mother does not

 offer an explanation as to why it is in Mike’s best interests to limit his options for

 adoption to a single family such as the Petersons, to the exclusion of his current

 6 Respondent-mother’s observation that the Petersons could be granted guardianship

 of Mike without terminating her parental rights is true, with or without her execution of the
 specific relinquishment. While guardianship provides some measure of permanence for the
 ward, see N.C.G.S. § 7B-600(b) (2019), it does not ensure the same degree of finality as
 adoption. Compare N.C.G.S. §§ 7B-600(b)–(b1), -1000 (2019) (authorizing review and
 termination of guardianship) with N.C.G.S. § 48-1-106 (2019) (describing legal effect of
 adoption and rights of adoptee).
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

 caretakers or other potential adoptive families.

¶ 50 The trial court’s written findings reflect its due consideration of the factors in

 N.C.G.S. § 7B-1110(a) and provide a reasoned basis for the trial court’s conclusion

 that the termination of respondent-mother’s parental rights would further Mike’s

 best interests by providing the juvenile with “a permanent plan of care at the earliest

 possible age.” See In re B.E., 375 N.C. at 750. We therefore hold that the trial court

 did not abuse its discretion in terminating the parental rights of respondent-mother

 and, consequently, we affirm the trial court’s order terminating respondent-mother’s

 parental rights.

 III. Conclusion

¶ 51 WCHS had standing to file a motion to terminate the parental rights of

 respondent-mother pursuant to N.C.G.S. 7B-1103(a)(3) because the juvenile Mike

 was placed in the custody of WCHS in February 2019 by a trial court of competent

 jurisdiction. Therefore, the trial court had subject matter jurisdiction to enter the

 order which terminated respondent-mother’s parental rights.

¶ 52 The trial court did not base its determination of Mike’s best interests upon a

 misapprehension of the law pertaining to the legal effect of respondent-mother’s

 specific relinquishment of her parental rights, nor did the trial court abuse its

 discretion in evaluating its considerations and reaching its conclusions regarding the

 juvenile’s best interests. The trial court properly considered the dispositional factors
 IN RE M.R.J.

 2021-NCSC-112

 Opinion of the Court

in N.C.G.S. § 7B-1110(a) in concluding that the termination of the parental rights of

respondent-mother was in the juvenile’s best interests. Accordingly, the trial court’s

order is affirmed.

 AFFIRMED.