IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-112

No. 37A21

Filed 24 September 2021

IN THE MATTER OF: M.R.J.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 30 September 2020 by Judge Monica Bousman in District Court, Wake County. This matter was calendared for argument in the Supreme Court on 19 August 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mary Boyce Wells for petitioner-appellee Wake County Human Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*Christopher M. Watford for respondent-appellant mother.*

MORGAN, Justice.

¶ 1     Respondent-mother appeals from the trial court's order terminating her parental rights to "Mike,"[1] a minor child born in April 2018. Because we conclude that the trial court had jurisdiction over the subject matter and did not abuse its discretion in determining Mike's best interests, we affirm.

## I.     Factual and Procedural Background

---

[1] We use pseudonyms to protect the identities of some of the individuals discussed in this opinion and for ease of reading. We note that the trial court's order also terminated the parental rights of Mike's father, whose identity is unknown.

In April 2018, Vance County Child Protective Services (VCCPS) received a report that Mike and his twin brother had tested positive for methadone and marijuana at birth. While VCCPS was assessing the family on 10 June 2018, the agency received a second report on the family that Mike's twin brother had died in respondent-mother's home. Respondent-mother stated that she had placed both children on a bed and later found the deceased child unresponsive.

On 10 June 2018, VCCPS placed Mike with Theresa R., an approved safety resource who lived in Wake County. The family was found to be in need of services, and the case was transferred from VCCPS to Wake County Human Services (WCHS) in August 2018.

A WCHS social worker scheduled a home visit with respondent-mother and Theresa R. for the afternoon of 15 October 2018. When the social worker arrived at the residence, Theresa R. reported that respondent-mother had removed Mike from the home on the previous day of 14 October 2018, claiming that respondent-mother was taking Mike to live with his maternal grandmother in South Carolina. Respondent-mother confirmed to the social worker on 15 October 2018 that she "sent" Mike to South Carolina to live with his maternal grandmother.

On 31 October 2018, the WCHS social worker visited respondent-mother at the Wake County Detention Center where respondent-mother was being held for violating her probation. Respondent-mother agreed to contact the social worker after

her release from jail but failed to do so.

WCHS was unaware of respondent-mother's whereabouts after her release from incarceration until 2 January 2019, when the social worker learned that respondent-mother was hospitalized at UNC Hospital with an infection. WCHS contacted respondent-mother and established a safety plan for Mike, pursuant to which he would continue to reside with the maternal grandmother in South Carolina. On the following day of 3 January 2019, respondent-mother gave the name of a friend of hers in Vance County to the social worker and asked for the friend to be considered as a placement for Mike. VCCPS conducted a home study of respondent-mother's recommended friend on behalf of WCHS but did not approve the friend as a placement.

On 16 January 2019, a safety assessment was performed on the maternal grandmother's home by Fairfield County, South Carolina, CPS. The grandmother's residence was approved for Mike's placement. Respondent-mother identified for WCHS another friend, Donna W., as a potential placement option for respondent-mother's children. On 30 January 2019, WCHS approved Donna W.'s home as a placement for Mike's older half-brother.

Respondent-mother was released from UNC Hospital on 1 February 2019, but she failed to respond to repeated telephone calls from WCHS social workers. On 8 February 2019, the maternal grandmother brought Mike to Wake County to visit

respondent-mother, after obtaining the approval of WCHS for Mike to stay overnight in Donna W.'s home. WCHS informed Donna W. and the maternal grandmother that Mike was to return to South Carolina on 10 February 2019.

¶ 9 The maternal grandmother reported that respondent-mother was incoherent and falling asleep during a supervised visit with Mike on 10 February 2019. On the next day of 11 February 2019, respondent-mother contacted law enforcement in Wake County and reported that Mike was with the maternal grandmother and that the maternal grandmother had been drinking alcohol. Multiple police units and a helicopter responded to the call. Officers detained the maternal grandmother and contacted WCHS, which confirmed that Mike was legally placed with the maternal grandmother and that she had not been drinking. Respondent-mother then sent numerous text messages to the WCHS social worker on 11 February 2019, threatening to remove Mike from his placement with the maternal grandmother and reminding the social worker that respondent-mother still had legal custody of the child.

¶ 10 On 13 February 2019, WCHS filed a juvenile petition alleging that Mike was neglected. The petition stated that respondent-mother "is reportedly still actively using heroin and is without stable housing" and that she "has not been compliant with any recommended services" or treatment to address her substance abuse and mental health issues. WCHS further alleged that respondent-mother "continues to

sabotage" Mike's placement with the maternal grandmother, "has not been willing to allow [Mike] to remain in a stable placement[,]" and "has a history of becoming upset with kinship providers/temporary safety providers and immediately removing the children from the home."

Based on the petition's verified allegations, the trial court granted nonsecure custody of Mike to WCHS on 13 February 2019. On 14 February 2019, Mike joined his older half-brother in a fictive kinship placement with Donna W. in Wake County.

The trial court conducted a hearing on the petition on 9 May 2019. Based on a written stipulation of facts signed by the parties, the trial court adjudicated Mike to be a neglected juvenile in that he "do[es] not receive proper care and supervision from [his] parents and live[s] in an environment injurious to [his] welfare." *See* N.C.G.S. § 7B-101(15) (2019). The trial court kept Mike in WCHS custody and awarded weekly supervised visitation with the child to respondent-mother. Mike remained in his placement with Donna W.

In addition to the aforementioned facts, the trial court found as follows:

> 30. The mother submitted to a substance abuse assessment and [was] diagnosed with Opiate Use Disorder Severe and given specific recommendations. She is using amounts of Heroin that are life threatening and needs to go into drug detoxification immediately . . . .
>
> 31. The mother is not in[ ]compliance with the terms and conditions of her probation and has stated that she is not visiting [Mike] because she is afraid of being arrested . . . .

> 32. The mother reports diagnoses of Bi-Polar Disorder and Personality Disorder . . . .

The trial court ordered respondent-mother to comply with her Out-of-Home Family Services Agreement (OHFSA) by immediately entering drug detoxification; participating in intensive outpatient drug treatment; refraining from the use of impairing substances; submitting to random drug screens; obtaining a psychiatric evaluation; obtaining a psychological evaluation and following any recommendations; refraining from criminal activity and complying with the conditions of her probation; participating in parenting classes and demonstrating learned parenting skills; obtaining and maintaining stable and appropriate housing and income; maintaining regular contact with the WCHS social worker; and regularly attending visitations.

¶ 14 The trial court held a permanency planning hearing on 5 August 2019 and entered an order on 19 September 2019 establishing a primary permanent plan of reunification with a secondary plan of adoption. The trial court found that respondent-mother had not maintained regular contact with the social worker or documented respondent-mother's completion of any court-ordered services. Respondent-mother had been incarcerated in the Vance County Jail through mid-July 2019, had additional pending charges in Wake and Franklin Counties, and had not visited with Mike since March 2019. The trial court concluded that respondent-mother "continues to act in a manner inconsistent with her [c]onstitutionally protected status as a parent . . . ."

At the next permanency planning hearing, in an order entered on 9 March 2020, the trial court changed Mike's primary permanent plan to adoption with a secondary plan of reunification. With regard to the requirements of her OHFSA, the trial court found that respondent-mother had failed to respond to the social worker's telephone calls, text messages, emails, or letters; was jailed in Vance County in January 2020 for violating her probation and resisting a public officer; had failed to comply with the recommendations of her substance abuse assessment; had failed to submit to any requested drug screens; had failed to attend a scheduled psychological evaluation or to reschedule the appointment; was discharged by her parenting coach for lack of communication and general noncompliance; and had failed to attend any visitations with Mike. The trial court determined that further efforts to reunify Mike with respondent-mother "clearly would be unsuccessful or inconsistent with [his] health or safety and need for a safe, permanent home within a reasonable time." *See* N.C.G.S. § 7B-906.2(b) (2019).

On 12 March 2020, WCHS filed a motion to terminate respondent-mother's parental rights to Mike. The trial court held a hearing on the motion on 10 July and 3 August 2020 and entered its "Order Terminating Parental Rights" on 30 September 2020. As grounds for termination, the trial court established that respondent-mother previously neglected Mike and was likely to subject him to further neglect if he was returned to her care, *see* N.C.G.S. § 7B-1111(a)(1) (2019), and that respondent-mother

willfully left Mike in an out-of-home placement for more than twelve months without making reasonable progress to correct the conditions leading to his removal, *see* N.C.G.S. § 7B-1111(a)(2). The trial court concluded that it was in Mike's best interests for the parental rights of respondent-mother to be terminated. *See* N.C.G.S. § 7B-1110(a) (2019).

Respondent-mother filed timely notice of appeal from the order terminating her parental rights.

## II.    Respondent-Mother's Arguments on Appeal

### A. Subject Matter Jurisdiction

Respondent-mother first claims that the trial court was without jurisdiction to enter the order terminating respondent-mother's parental rights because WCHS lacked standing to initiate the termination proceeding under N.C.G.S. § 7B-1103(a) (2019).

"Whether or not a trial court possesses subject-matter jurisdiction is a question of law that is reviewed de novo. Challenges to a trial court's subject-matter jurisdiction may be raised at any stage of proceedings, including for the first time before this Court." *In re A.L.L.*, 376 N.C. 99, 101 (2020) (extraneity omitted). However, "[t]his Court presumes the trial court has properly exercised jurisdiction unless the party challenging jurisdiction meets its burden of showing otherwise." *In re L.T.*, 374 N.C. 567, 569 (2020).

¶ 20 The statute that confers subject matter jurisdiction over termination of parental rights proceedings provides as follows:

> The court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion. . . . Provided, that before exercising jurisdiction under this Article, the court shall find that it has jurisdiction to make a child-custody determination under the provisions of G.S. 50A-201, 50A-203, or 50A-204.

N.C.G.S. § 7B-1101 (2019). The Juvenile Code defines "[c]ourt" as "[t]he district court division of the General Court of Justice." N.C.G.S. § 7B-101(6) (2019).

¶ 21 Respondent-mother does not claim that the District Court, Wake County failed to meet the general jurisdictional requirements of N.C.G.S. § 7B-1101; she instead contends that WCHS lacked standing under N.C.G.S. § 7B-1109(a) to initiate the termination proceeding in this case. Respondent-mother's argument is well summarized by the Court of Appeals opinion in *In re E.X.J.*:

> Under N.C.[G.S.] § 7B-1103(a)(3) (20[19]), a petition or motion to terminate the parental rights of a parent may be filed by a "county department of social services . . . to whom custody of the juvenile has been given by a court of competent jurisdiction." If DSS does not lawfully have custody of the children, then it lacks standing to file a petition or motion to terminate parental rights, and the trial court, as a result, lacks subject matter jurisdiction.

*In re E.X.J.*, 191 N.C. App. 34, 39 (2008) (ellipsis in original), *aff'd per curiam*, 363

N.C. 9 (2009).

Respondent-mother contends that WCHS was not "a proper party" authorized to file the petition which alleged that Mike was neglected in February 2019. She opines that Mike was a resident of South Carolina when the petition was filed and when the District Court, Wake County purported to grant nonsecure custody of the child to WCHS on 13 February 2019. Respondent-mother also contends that the petition filed by WCHS "fail[ed] to establish that [her] legal residence was in Wake County." As a result, "because the [WCHS] director had no authority over a child whose legal residence was in South Carolina, the petition was void for lack of subject matter jurisdiction[,]" and "the initial order granting nonsecure [custody] was invalid[.]" Respondent-mother consequently reasons that the District Court, Wake County was not "a court of competent jurisdiction" when it awarded WCHS custody of Mike, and WCHS "lacked standing to move for the termination of [respondent-mother's] parental rights" under N.C.G.S. § 7B-1103(a)(3).

"North Carolina district courts have 'exclusive, original [subject matter] jurisdiction over any case involving a juvenile who is alleged to be abused, neglected, or dependent.'" *In re E.X.J.*, 191 N.C. App. at 47 (alteration in original) (quoting N.C.G.S. § 7B-200 (2005)). "A trial court's subject matter jurisdiction over all stages of a juvenile case is established when the action is initiated with the filing of a properly verified petition." *In re T.R.P.*, 360 N.C. 588, 593 (2006). Under N.C.G.S.

§ 7B-401.1(a), "[o]nly a county director of social services or the director's authorized representative may file a petition alleging that a juvenile is abused, neglected, or dependent." N.C.G.S. § 7B-401.1(a) (2019).

In interpreting N.C.G.S. § 7B-401.1(a), respondent-mother notes that N.C.G.S. § 7B-101(10) defines "Director" as "the director of the department of social services in the county in which the juvenile resides or is found, or the director's representative . . . ." She then points to N.C.G.S. § 153A-257(a) (2019), which allocates the responsibility for providing social services among the state's local social services agencies based on the recipient's county of residence. "Read in *paria materi* [sic]," respondent-mother argues that "both of these statutes are meant to identify the director, if any, who is responsible for providing a service, such as filing a juvenile petition, and both unquestionably tie that identification to location."

Based on her reading of the statutes, respondent-mother asserts that

> [t]he director of Wake County, and by extension, any authorized representative, was without statutory authority to file the juvenile petition in this matter. It is undisputed that [Mike] resided in South Carolina with his grandmother for 131 days including the day of the filing of the Petition. It is undisputed that [respondent-mother's] actual location was unknown and that Wake County made no representation as to where they believed her to reside. No document indicates that the child "was found in" Wake County prior to anytime before the filing of the petition. Thus, under both G.S. § 7B-101 and G.S. § 153A-247, Wake County has no authority over Mike at the time of filing.

Respondent-mother's positions are inconsistent with the factual record before

this Court. Moreover, her legal arguments appear to address the issue of venue and thus do not implicate the trial court's subject matter jurisdiction to place Mike in WCHS custody.

¶ 27     We have previously considered and rejected the claim that the definition of "Director" found in N.C.G.S. § 7B-101(10) imposes a geographical limit on which "county director" may invoke the trial court's subject matter jurisdiction by filing a juvenile petition under N.C.G.S. § 7B-401.1(a). Regarding this circumstance, this Court has stated:

> Because the language of section 7B-401.1(a) identifies "a county director of social services" as the proper petitioner in a juvenile adjudication action rather than "the director" (importing the definition from N.C.G.S. § 7B-101(10)) or similar language singling out particular directors, we hold that the legislature did not intend to limit the class of parties who may invoke the court's subject matter jurisdiction in juvenile adjudication actions to only directors of county departments of social services in the county where the juvenile at issue resides or is found.

*In re A.P.*, 371 N.C. 14, 20 (2018). Nor does N.C.G.S. § 153A-257(a) purport to limit the trial court's subject matter jurisdiction in juvenile abuse, neglect, and dependency cases.[2]

---

[2] Respondent-mother attempts to replace the requirement of the *trial court'*s subject matter jurisdiction with a novel concept of a *petitioner's* subject matter jurisdiction, arguing that "because the [WCHS] director had no authority over a child whose legal residence was in South Carolina, *the petition was void for lack of subject matter jurisdiction.*" (Emphasis added).

The question of which county director of social services is sanctioned to file a juvenile petition is answered by the venue statute N.C.G.S. § 7B-400, which provides:

> A proceeding in which a juvenile is alleged to be abused, neglected, or dependent may be commenced in the judicial district in which the juvenile resides or is present at the time the petition is filed. . . . Notwithstanding G.S. 153A-257, the absence of a juvenile from the juvenile's home pursuant to a protection plan during an assessment or the provision of case management services by a department of social services shall not change the original venue if it subsequently becomes necessary to file a juvenile petition.

N.C.G.S. § 7B-400(a) (2019).

"Improper venue is *not jurisdictional*, and it is subject to waiver." *Stokes v. Stokes*, 371 N.C. 770, 773 (2018) (emphasis added). Unlike the issue of subject matter jurisdiction, which may be raised at any time, an objection to improper venue is waived if not "taken in apt time" in the trial court. *McMinn v. Hamilton*, 77 N.C. 300, 301 (1877); *see also* N.C.G.S. § 1A-1, Rule 12(h)(1) ("A defense of . . . improper venue . . . is waived (i) if omitted from a motion [made under Rule 12], or (ii) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course."). Because respondent-mother made no claim of improper venue at any time in the trial court while this matter was pending in the lower forum, the issue of venue is waived and therefore is not properly before this Court. *See* N.C. R. App. P. 10(a)(1).

Moreover, contrary to respondent-mother's characterization, the record

demonstrates that Wake County is a proper venue for the juvenile proceeding initiated on 13 February 2019. The verified petition filed by WCHS expressly alleged that Mike "resides in the district at the address shown below, was found in the district as alleged herein, or venue exists pursuant to G.S. 7B-400(a) or (b)." Although the petition did not list respondent-mother's street address, it identified her as "a citizen and resident of Wake County, North Carolina[.]"[3] The petition further averred—and respondent-mother subsequently stipulated—that Mike was living in South Carolina with his maternal grandmother pursuant to a safety plan that WCHS established with respondent-mother on 2 January 2019. *See* N.C.G.S. § 7B-400(a) ("[T]he absence of a juvenile from the juvenile's home pursuant to a protection plan during an assessment or the provision of case management services by a department of social services shall not change the original venue if it subsequently becomes necessary to file a juvenile petition."). Finally, the petition's allegations—and the parties' signed stipulations entered on 8 May 2019—indicated that Mike was visiting Wake County with his grandmother and was therefore "present" in the county at the time that

---

[3] Respondent-mother later stipulated that she was "a citizen and resident of Henderson, North Carolina[.]" Although Henderson is located in Vance County rather than Wake County, North Carolina, this potential discrepancy had no effect on the trial court's subject matter jurisdiction. *See generally In re A.P.*, 371 N.C. at 20 ("hold[ing] that the legislature did not intend to limit the class of parties who may invoke the court's subject matter jurisdiction in juvenile adjudication actions to only directors of county departments of social services in the county where the juvenile at issue resides or is found."). Moreover, since it is unclear from the record here, there is the prospect that respondent-mother was a Wake County resident when WCHS filed its petition in February 2019 yet was a Vance County resident when she signed the stipulation in March or May of 2019.

WCHS filed the petition on 13 February 2019.[4] N.C.G.S. § 7B-400(a) (allowing proceeding to "be commenced in the judicial district in which the juvenile resides or is present at the time the petition is filed").

¶ 31    Respondent-mother also frames her challenge to the trial court's jurisdiction in terms of the statutory requirement that a juvenile petition be verified pursuant to N.C.G.S. § 7B-403(a) by the "county director of social services or the director's authorized representative[.]" N.C.G.S. § 7B-401.1(a); *see also* N.C.G.S. § 7B-403(a) ("[T]he petition shall be drawn by the director, *verified* before an official authorized to administer oaths, and filed by the clerk . . . ." (emphasis added)). In doing so, respondent-mother quotes our opinion in *In re T.R.P.* for the principle that "[a] trial court's subject matter jurisdiction over all stages of a juvenile case is established when the action is initiated with the filing of a *properly verified* petition." *In re T.R.P.*, 360 N.C. at 593 (emphasis added). She goes on to contend that, in the present case, "[t]he initial juvenile petition seeking custody of Mike was *improperly verified* and thus did not grant the court subject matter jurisdiction to issue the initial non-secure

---

[4] The petition and the parties' stipulations describe the maternal grandmother's attainment of WCHS's approval to visit Wake County with Mike on 8 February 2019 and "to stay overnight at the home of Mrs. Donna W[.] during [the] visit." Although Mike and his grandmother "were to return to South Carolina . . . on Sunday, February 10, 2019[,]" they remained in Wake County at least through 11 February 2019, when respondent-mother called the police and reported that Mike was with his maternal grandmother who had been drinking. "Wake County police . . . responded and detained [the maternal grandmother] until they got in contact with [WCHS] After [H]ours who assisted with ensuring that [Mike was] legally placed in the care of [the grandmother] and [she] had not been drinking[.]"

custody order on 13 February 2019." (Emphasis added).

¶ 32     In *In re T.R.P.*, this Court held that the Wilkes County Department of Social Services' "failure to verify [its] juvenile petition is a fatal defect" depriving the trial court of subject matter jurisdiction. 360 N.C. at 598. We noted that, "[a]lthough the juvenile petition setting forth these allegations [of neglect] was notarized, it was neither signed nor verified by the Director of WCDSS or any authorized representative thereof." *Id*. at 589. Other cases cited by respondent-mother likewise involved a petitioner's failure to verify its petition in accordance with N.C.G.S. § 7B-403(a). *See In re S.E.P.*, 184 N.C. App. 481, 487 (2007) ("Neither the 26 September 2002 adjudication petition nor the 8 April 2004 amended petition conferred subject matter jurisdiction upon the trial court" because (1) "the alleged signature which appears on the [original] petition was not in fact the director's signature[,]" and (2) "[t]he verification section of the amended petition shows no signature in the 'Signature of Petitioner' space."); *In re A.J.H-R.*, 184 N.C. App. 177, 180 (2007) (concluding that the trial court "lacked subject matter jurisdiction to adjudicate this matter" where the juvenile neglect petitions were "neither signed nor verified" by the agency's director or his authorized representative).

¶ 33     In the instant case, the petition filed by WCHS was properly verified before a notary by social worker Martheia Capel, acting as the authorized representative of WCHS Director Regina Petteway, thereby satisfying the verification requirement in

N.C.G.S. § 7B-403(a). Given this obvious distinction, respondent-mother's reliance on *In re T.R.P.* and similar cases is misplaced and unavailing. *See In re T.R.P.*, 360 N.C. at 589 ("Although the juvenile petition . . . was notarized, it was neither signed nor verified by the Director of WCDSS or any authorized representative thereof.").

¶ 34        Having addressed respondent-mother's arguments challenging the trial court's subject matter jurisdiction, we next consider whether the trial court properly exercised its recognized jurisdiction in light of the fact that Mike was living in South Carolina with his maternal grandmother at the time that the petition was filed. We conclude that the trial court had such jurisdiction.

¶ 35        In North Carolina, the issue of whether the courts of a particular *state* have jurisdiction over a proceeding which affects child custody is governed by the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), specifically the provisions of Article 2, Part 2 as codified in N.C.G.S. §§ 50A-201 through -210 (2019). *See, e.g.*, N.C.G.S. § 7B-1101 ("[B]efore exercising jurisdiction under this Article, the court shall find that it has jurisdiction to make a child-custody determination under the provisions of G.S. 50A-201, 50A-203, or 50A-204."). "The trial court must comply with the UCCJEA in order to have subject matter jurisdiction over juvenile abuse, neglect, and dependency cases and termination of parental rights cases." *In re L.T.*, 374 N.C. at 569. Although respondent-mother makes no mention of these statutes, nonetheless the scope of the trial court's subject matter jurisdiction here, and the

extent to which it is impacted—if at all—by the availability of the courts of South Carolina, is properly determined by consulting the applicable provisions of this enactment.

¶ 36        Under the UCCJEA,

> [g]enerally, North Carolina courts have jurisdiction to make a child custody determination if North Carolina is the home state of the child. N.C.G.S. § 50A-201(a)(1). " 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." N.C.G.S. § 50A-102(7) (2017). If a court of another state has home state jurisdiction, North Carolina courts do not have jurisdiction unless one of several statutory exceptions applies.

*In re S.E.*, 373 N.C. 360, 364 (2020).

¶ 37        Respondent-mother observes that "[i]t is undisputed that [Mike] resided in South Carolina with his grandmother for 131 days including the day of the filing of the Petition" on 13 February 2019. Because 131 days is less than the six consecutive months required by N.C.G.S. § 50A-102(7) for home state recognition, South Carolina is not Mike's home state for jurisdictional purposes under the UCCJEA. Furthermore, as the guardian ad litem correctly notes, Mike was born in late April of 2018 and therefore had not been alive for a full six months at the time that he left North Carolina to live with his maternal grandmother in South Carolina on 15 October 2018. We agree with the contention that Mike had no home state under the UCCJEA,

because (1) Mike had not lived in any state for at least six consecutive months prior to the petition being filed, and (2) although Mike was less than six months of age, he had not lived from birth in any one state with a parent or person acting as a parent. N.C.G.S. § 50A-102(7).

¶ 38 Also, the UCCJEA provides, due to North Carolina's adoption of it, that "a court of this State has jurisdiction to make an initial child custody determination" in the following circumstances:

> a. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and
>
> b. Substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships[.]

N.C.G.S. § 50A-201(a)(2) (2019). "The trial court is not required to make specific findings of fact demonstrating its jurisdiction under the UCCJEA, but the record must reflect that the jurisdictional prerequisites in the Act were satisfied when the court exercised jurisdiction." *In re L.T.*, 374 N.C. at 569.

¶ 39 The record in the case sub judice illustrates that both Mike and respondent-mother had a significant connection with North Carolina beyond their mere presence in the state at the time WCHS filed its petition on 13 February 2019. *See* N.C.G.S. § 50A-201(a)(2)(a). Respondent-mother had been a North Carolina resident at least since Mike's birth and had a CPS history in both Vance and Wake Counties. M.T.,

one of respondent-mother's older children, and two of respondent-mother's safety resources, Theresa R. and Donna W., were also North Carolina residents. Respondent-mother was also on probation in North Carolina and had additional criminal charges pending. Mike was born in North Carolina and lived in the state before he was taken to South Carolina to live with his maternal grandmother on 15 October 2018. Mike's mother and an older sibling continued to reside in North Carolina at the time that the petition was filed.

¶ 40 The record further reflects that substantial evidence was available in North Carolina regarding Mike's care and family history at the time that the petition was filed. *See* N.C.G.S. § 50A-201(a)(2)(b). Respondent-mother, Theresa R., and Donna W. were all located in North Carolina, and so were (1) the hospital where Mike was born and where Mike tested positive for methadone and marijuana, (2) two child protective services agencies that investigated, and consistently provided services to, the family since Mike's birth, and (3) the police department that responded to respondent-mother's false report of Mike's abduction by his maternal grandmother on 11 February 2019. Therefore, the District Court, Wake County properly exercised "significant connection" jurisdiction under the UCCJEA.

¶ 41 We conclude that the trial court possessed subject matter jurisdiction over the juvenile petition filed by WCHS on 13 February 2019. The trial court thereupon entered its orders placing Mike in WCHS custody in the trial court's capacity as "a

court of competent jurisdiction." N.C.G.S. § 7B-1103(a)(3). Accordingly, WCHS had standing under N.C.G.S. § 7B-1103(a)(3) to file its motion to terminate respondent-mother's parental rights on 12 March 2020 and the trial court had jurisdiction to issue the termination of parental rights order.

**B. Best Interests Determination**

¶ 42        Respondent-mother contends that the trial court abused its discretion at the dispositional stage of the proceeding by determining that it was in Mike's best interests to terminate her parental rights. Respondent-mother argues that the trial court did not need to terminate her parental rights because respondent-mother had already executed a conditional relinquishment or "specific relinquishment" of her rights authorizing Mike to be adopted by her sister and brother-in-law (the Petersons).[5] Respondent-mother asserts that the trial court mistakenly believed that terminating her parental rights was necessary to provide Mike with legal protections beyond those which were conferred by her relinquishment.

¶ 43        Under N.C.G.S. § 7B-1110(a), if the trial court adjudicates the existence of one or more statutory grounds for terminating a respondent-parent's rights,

> it proceeds to the dispositional stage where it must
> "determine whether terminating the parent's rights is in

---

[5] Although respondent-mother posits that the termination order effectively "terminated parental rights of a parent that did not exist[,]" she asserts that her appeal is not moot because the order may result in adverse collateral consequences to her "including[,] but not limited to, a potential termination of parental rights to future children under [N.C.]G.S. § 7B-1111(a)(9) [(2019)]."

the juvenile's best interest" based on the following factors:

(1) The age of the juvenile.

(2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

*In re J.J.B.*, 374 N.C. 787, 791 (2020) (quoting N.C.G.S. § 7B-1110(a)).

¶ 44        The trial court's determination of a juvenile's best interests under N.C.G.S. § 7B-1110(a) is reviewed only for abuse of discretion. *In re B.E.*, 375 N.C. 730, 745 (2020). "Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* at 745 (quoting *In re J.J.B.*, 374 N.C. at 791). An abuse of discretion may occur if the trial court bases its best interests determination on a misunderstanding of the relevant law. *Id.*

¶ 45        Although she did not produce such a document in court, respondent-mother adduced testimony at the dispositional hearing that she executed a relinquishment

of her parental rights to Mike on 10 July 2020, conditioned upon his adoption by the Petersons. *See* N.C.G.S. § 48-3-704 (2019). The trial court made the following findings of fact related to the dispositional criteria in N.C.G.S. § 7B-1110(a):

> 32.     The primary permanent plan for the child is adoption and termination of the parents' parental rights will aid in the accomplishment of the primary permanent [plan].
>
> 33.     The child is 2 years of age. He is young and healthy and has no developmental issues that are likely to be a barrier to adoption.
>
> 34.     . . . The child has been out of the care of the mother since he was approximately 38 days old. He has had limited and inconsistent contact with the mother since that time. He does not have a substantial parent-child relationship with the mother.
>
> 35.     The child was placed in the home of [Donna W. and her husband] as requested by the mother when he came into foster care. He has remained in that home since that time. His needs are being met in the home and they are willing to adopt the child. He has developed a strong, appropriate parent-child bond with them. He is happy and healthy. He looks to them for comfort, and accepts discipline from them.
>
> 36.     The mother has a sister and brother in law ("the [Petersons]") in South Carolina [who] submitted to an ICPC home study for possible placement of the child. They would also be willing to adopt the child. The ICPC home study was positive. The [Petersons] and the child have had a few visits since February, 2020. The child does not have a parental bond with the [Petersons] at the present time but he has the ability to . . . bond with caregivers and could bond with them if they are chosen to adopt him.
>
> 37. The child's young age and availability of at least two

families that are committed to adopting him indicates
[there] is a high probability that this child will be adopted.
He is in need of a permanent plan of care at the earliest
possible age which can be obtained only by the severing of
the relationship between the child and his parents by
termination of the parental rights of the parents.

As respondent-mother does not contest these findings, they are binding on appeal. *In re A.M.O.*, 375 N.C. 717, 720 (2020).

In support of her claim that the trial court acted under a misapprehension of law, respondent-mother points to the trial court's statement in open court which expressed concern that Mike might be left without a permanent placement for an extended period of time if the trial court did not elect to terminate respondent-mother's parental rights and the Petersons were subsequently unable to adopt the child:

> [Counsel for respondent-mother] makes a very valid point
> that if I did not find [terminating respondent-mother's
> parental rights] was in [Mike's] best interest that the
> mother's already signed relinquishments and that the
> [Petersons] could -- could just then adopt him. We all know
> that things happen that none of us plan. Something may
> happen in the future that even if the [Petersons] were
> chosen to be the adoptive parents, it could be that
> something would happen to them. And I am not wishing
> anybody any bad luck. Believe me. But -- but things
> happen.
>
> Af -- after presiding in this courtroom for seventeen and a
> half years, I am very well aware of things that happened
> that interrupt the adoption process. And that is not in
> [Mike's] best interest. And then we would be right back
> where we would -- where -- where we are right now a year

from now, two years from now, or something like that, and [Mike] still would not have permanence if the [Petersons] were unable to adopt him and if I found that it wasn't in his best interest.

¶ 47    Respondent-mother asserts that "it is very possible that Mike can find permanence through adoption with the [Petersons]," and that, even if the Petersons were ultimately granted guardianship of Mike in lieu of adoption, "that too is a permanency outcome which does not mandate the termination of [her] parental rights." She notes that the trial court made no findings explaining "what conditions might be encountered that would interrupt the [Petersons'] adoption process, or somehow stall permanence for Mike." Moreover, notwithstanding the trial court's articulated concerns, respondent-mother argues that the trial court erred in believing that it was necessary to terminate respondent-mother's parental rights in order to provide permanency for Mike. She suggests that the trial court could have "held open a decision as to [her parental rights] to see if Mike actually found permanence with the [Petersons]."

¶ 48    Respondent-mother's argument is unpersuasive. Assuming that respondent-mother did, in fact, execute a valid specific relinquishment of her parental rights to Mike expressly to facilitate Mike's adoption by the Petersons, the adoption statutes permit her to revoke her relinquishment if, for whatever reason, the Petersons did

not adopt Mike.[6] *See* N.C.G.S. §§ 48-3-704, -707(b) (2019). Irrespective of the Petersons' willingness or ability to adopt the child, respondent-mother was also free to challenge the relinquishment at any time prior to entry of the adoption decree on the ground that the relinquishment was "obtained by fraud or duress." N.C.G.S. § 48-3-707(a)(1) (2019). In either case, Mike would be needlessly denied permanence for some period of time. *See* N.C.G.S. § 48-3-707(c). The trial court's recognition of potential hindrances, whether general or specific, to the realization of Mike's primary permanent plan of adoption does not reflect either a misapprehension of the law or an abuse of discretion in the trial court's contemplation here of the juvenile's best interests.

¶ 49        By terminating respondent-mother's parental rights, the trial court facilitated Mike's adoption by the Petersons, by Donna W. and her husband—who had already developed "a strong, appropriate parent-child bond" with the child—and by any other adoptive parents identified and approved by WCHS. Respondent-mother does not offer an explanation as to why it is in Mike's best interests to limit his options for adoption to a single family such as the Petersons, to the exclusion of his current

---

[6] Respondent-mother's observation that the Petersons could be granted guardianship of Mike without terminating her parental rights is true, with or without her execution of the specific relinquishment. While guardianship provides some measure of permanence for the ward, *see* N.C.G.S. § 7B-600(b) (2019), it does not ensure the same degree of finality as adoption. *Compare* N.C.G.S. §§ 7B-600(b)–(b1), -1000 (2019) (authorizing review and termination of guardianship) with N.C.G.S. § 48-1-106 (2019) (describing legal effect of adoption and rights of adoptee).

caretakers or other potential adoptive families.

The trial court's written findings reflect its due consideration of the factors in N.C.G.S. § 7B-1110(a) and provide a reasoned basis for the trial court's conclusion that the termination of respondent-mother's parental rights would further Mike's best interests by providing the juvenile with "a permanent plan of care at the earliest possible age." *See In re B.E.,* 375 N.C. at 750. We therefore hold that the trial court did not abuse its discretion in terminating the parental rights of respondent-mother and, consequently, we affirm the trial court's order terminating respondent-mother's parental rights.

## III.    Conclusion

WCHS had standing to file a motion to terminate the parental rights of respondent-mother pursuant to N.C.G.S. 7B-1103(a)(3) because the juvenile Mike was placed in the custody of WCHS in February 2019 by a trial court of competent jurisdiction. Therefore, the trial court had subject matter jurisdiction to enter the order which terminated respondent-mother's parental rights.

The trial court did not base its determination of Mike's best interests upon a misapprehension of the law pertaining to the legal effect of respondent-mother's specific relinquishment of her parental rights, nor did the trial court abuse its discretion in evaluating its considerations and reaching its conclusions regarding the juvenile's best interests. The trial court properly considered the dispositional factors

in N.C.G.S. § 7B-1110(a) in concluding that the termination of the parental rights of respondent-mother was in the juvenile's best interests. Accordingly, the trial court's order is affirmed.

AFFIRMED.